KANSAS CITY, FT. S. & M. R. CO. v. COOK.

(Circuit Court of Appeals, Sixth Circuit. February 5, 1895.)

No. 209.

1. RAILROAD COMPANIES—DUTY TOWARD TRESPASSERS—NEGLIGENCE.

The K. Ry. Co. had yards for making up and switching trains, on both sides of the M. river, between which trains were carried on steam ferry-

boats operated by the railway company, and on which no persons except passengers on the railway trains were permitted to travel. C., for purposes of curiosity only, and having been told by friends that he could cross the river without charge on the railway company's boats, crossed the river, and, having seen what he wanted to see, boarded another boat to return. Being discovered by an officer of the boat before it started. C. was told that he could not cross on the boat, and must leave it and the company's premises. The only way to get off the premises was by crossing the railway yard. This course was pointed out by the officer of the boat to C., in reply to his' inquiry, and he set out to cross the yard, which was filled with tracks and switches. While doing so, he was struck by an engine and injured. There was a conflict of evidence as to whether a bell was rung on the engine, but it appeared that, after C. was discovered, nothing could have been done to avert the accident. *Held* that, C. being a trespasser, the railway company owed him no duty, except to refrain from wanton or reckless injury to him, and was not responsible for the injury suffered.

2. SAME—CONTRIBUTORY NEGLIGENCE.

C., after leaving the boat, walked for some distance along a track, without looking behind him to see if a train or engine were approaching him from his rear. *Held*, that under the circumstances of the place, where cars and engines were obviously likely to be moving in either direction at any time, such omission was, in itself, contributory negligence on C.'s part.

In Error to the Circuit Court of the United States for the Western Division of the Western District of Tennessee.

This writ of error was sued out by the Kansas City, Ft. Scott & Memphis Railroad Company, against which company the appellee, Jesse H. Cook, recovered a judgment for damages sustained by being run over by a locomotive engine while running backward in its private switching yards in the village of West Memphis, state of Arkansas. The suit was begun in a state court at Memphis, Tenn., from which the railway company, as a nonresident corporation, removed the suit to the circuit court of the United States for the Western division of the Western district of Tennessee. West Memphis is a small village, of from two to three hundred inhabitants, and is immediately on the west bank of the Mississippi river and opposite the city of Memphis. The cars of the appellant company coming from the west and northwest are transferred by a railway ferry from West Memphis to the east bank of the river. On both banks of the river were inclined railway tracks, by means of which its trains were loaded on or discharged from the steam ferry. These inclined tracks connected with switching yards on both sides of the river, where trains arriving and departing were made up, and where continual switching was going on. The steam ferry was owned and operated exclusively by the railway company, and did not engage in any other business than that of transferring railway trains from one side of the river to the other. The officers of the boats were prohibited from carrying passengers other than those in the company's cars, and its servants and employés. There was a regular steam passenger ferry operated between Memphis and West Memphis for the accommodation of the general public. The defendant in error, a farmer, from the state of Mississippi, and a stranger, was, while visiting friends in Memphis, informed by them that he could pass over the river on railway transfer boats without charge, and from the west side get a better view of a great railway bridge in course of construction across the Mississippi. Acting upon this information, and wholly from motives of curiosity, he, together with some chance acquaintances, went aboard one of the transfer boats, and crossed to West Memphis. His presence on the boat seems to have been unobserved, as no questions were asked him or fare or permit demanded. He then made his way through the yards of the company to a point from which he could examine the railroad bridge. When ready to return, his friends having returned by way of the uncompleted bridge, he made his way back through the switching yard, and down the incline, and onto the transfer boat. He found thereon a passenger train about to be

transferred to Memphis. He was asked by the conductor of the train if he had come down on the train, to which he replied that he had not. Shortly afterwards he was approached by one of the officers of the boat, who asked him if he had come across on the boat, who, on being told that he had not, said that the boat did not take passengers, and that he could not return that way. He then asked what he must do, and was told that he would have to get off and go to the depot, where he would find a ferryboat which would take him across. He offered to pay to cross, but was told again that that boat did not take passengers across. Cook then says he asked the officer to show him the way he must go, and that the officer took his arm, and told him that he must get off, and must go up the railroad track. The west bank of the river is a low bottom, and subject to overflow. The railroad company, for its own uses, had made an embankment, which was entirely occupied by its tracks and switches. The top of this embankment was above high water. This embankment and its tracks constituted the switching yard of the company. At the time of the accident, the river was out of its banks, and there was water on both sides of the embankment. On this embankment there were four principal tracks, besides switches and spur tracks. These tracks were quite close together, there being a space of fourteen feet between the center of one track and the center of that adjoining. It was possible to walk between the tracks, there being a minimum of two feet clear space when each track was occupied by the widest cars in use. Between the outside tracks and slope of the embankment it was possible to walk in safety at some points; at others the slope of the embankment was too great. The West Memphis depot was near the northern end of this yard. The regular ferry landing was immediately in the rear of this depot. One of the streets of the village crossed this yard at the north end of the depot, and this street was the route both to depot and ferry landing behind it. There was no other way, in the then stage of the river, for one to get from the transfer boat than that by way of this embankment to the depot. When there, one could turn to the left on this traveled way and go west to the village, or turn to the left and go down to the ferry landing. The point where plaintiff was overtaken and run down was about 250 feet south of the street or way crossing the yard at depot, and on the direct and only way out of the yard, whether he wished to turn east or west when he reached this street. One of plaintiff's witnesses, acquainted with the location, in answer to a question as to whether there was any other way Cook could have gotten up to the depot except by those tracks, said: "After he got off the transfer boat, he would have to come up the tracks to get out anywhere." A plank walk led from back end of depot to the ferry landing. By all the testimony it is shown that engines or trains were in almost continuous motion within the limits of this yard, and all agree that it was an extremely dangerous place for use as a walkway, especially by one unacquainted with the tracks and their uses.

E. F. Adams and C. H. Trimble (Wallace Pratt, of counsel), for plaintiff in error.

George Gillham, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The most favorable statement of the circumstances immediately attendant upon the accident is that made by the defendant in error. The statement was that while in the yard of the appellant company, under the circumstances heretofore stated, and while making his way through that yard for the purpose of reaching the passenger ferryboat, he was walking upon the most westerly of the yard tracks when he met an engine, with tender attached, coming from the direction of the depot; that he stepped off of

that track to the one on his left, and had walked 20 or 25 yards in a northerly direction upon that track when some one between him and the depot, towards which he was walking, called out to him, "The train is going to run over you;" that he immediately looked back, when he was struck and knocked down and run over by an engine moving backward, with its tender in front. He made an effort to climb or catch onto the rear of the tender, failed, and was run over, losing a leg, and sustaining other very serious injuries. At the same time a train was passing on the track he had shortly before abandoned. He says he heard no bell or whistle, and did not hear the engine approaching from the rear. The engine which ran over him, he says, was the same engine which he had met and given way to when he stepped over to the track next on his left. That engine had just brought in the Kansas City train, had been taken charge of by the roundhouse employés, cut loose from its train, and was being taken to the roundhouse. To get there, it had to be taken towards the transfer landing on the west track, to a point about midway between the depot and incline, and then switched to the track next east, and backed some 200 yards, on the track upon which Cook was walking, to the roundhouse switch. According to the theory of plaintiff, this engine passed Cook, then reversed its direction, and took the track plaintiff was on, and ran him down.

Plaintiff's contention is that the railroad company was negligent in not warning him of his danger in time to get off the track. He says a switchman was seated on the rear end of the tender, with his legs hanging over, and that he should have seen the danger and given him notice. This very employé was introduced as a witness by the plaintiff, and he testifies that, as soon as he saw him on the track, he warned the engineer, but that there was not time to do more, for the rear of the tender struck him and the injury was done before anything could be done to avoid it. There was no evidence that any employé on the engine or tender was aware of the dangerous position of plaintiff until at the very moment of the collision, and no evidence that, after his danger became known, any effort to avoid injury would have averted the catastrophe. The evidence as to whether a bell was being sounded was contradictory. If any duty rested upon the railroad company to keep some one on the lookout ahead, or to keep a bell sounding, when engines or cars were being moved over its tracks and switches, then there was evidence tending to show negligence. But, if the liability of the railroad company depends upon the exercise of all reasonable precaution to avert the impending danger after it had knowledge of the dangerous position of the plaintiff, then the plaintiff made no case, and the request made to so instruct the jury, on the conclusion of all the evidence, should have been granted.

There was no question as to the duty of the railroad company at a public road crossing. This yard and these tracks were crossed by what the witnesses call a "paper street," near the depot. But that way was several hundred feet north of where this accident

occurred.    Still further north was another path, crossing at a point where there was but one track.    Neither was there any question as to the duty of a railroad company to a passenger.    The court very properly eliminated every question of that sort by telling the jury that there was no evidence tending to show the relation of passenger and carrier.

Was the railroad company guilty of any negligence?    The answer depends upon the duty and obligation resting upon it in respect to a person in its private switching yard under the circumstances detailed.    When he crossed from Memphis to West Memphis, he did so in violation of the regulations of the company owning and operating the transfer boat.    He did so without the invitation of any one having authority to suspend that rule. Whether his presence on the boat was unobserved, or he was there by the improper connivance of those on the boat, is equally immaterial, for he was, in either event, there without legal right, and necessarily a trespasser.    When he had concluded his visit to the west bank, and again entered the yard of the company, and again entered upon the boat, he resumed his status as a trespasser.    This much the court distinctly charged.    The only duty which the law imposed under such circumstances is that the owner thus intruded upon will not wantonly and unnecessarily inflict injury upon the trespasser.

The learned judge who presided upon the trial in the circuit court was of opinion that when he left the boat, under order of its officer, and undertook to make his way through the yard of the company to the public ferry, a little higher up the river, while going through the yard the duty of the company was to afford him that degree of protection due from the company to strangers in that yard, by some species of invitation or license, express or implied.    The view entertained by the circuit court is best shown by his instruction to the jury on this point, in regard to which he said:

"I think any reasonable man will say that, because he was violating their rules and regulations in being on their boat, they had no right to embarrass him in any way by putting him off their boat, and then claiming he was a trespasser on their grounds because he was a trespasser there originally. When they determined to enforce their rule that he should not come back across the river on their boat, they necessarily imposed upon him the duty, and it appears from the proof in this case, beyond any sort of dispute, that the captain, or somebody on the boat whom he took to be the captain, told him he must go to the Bryan, and come back across the river on that boat. He was undertaking to do that.    Now, I say to you that it would be wholly unreasonable—and you know it would be unreasonable—to say that man, as against this company, putting him in that situation, was a trespasser upon their premises upon the other side of the river, if it was necessary for him to be on those premises to get to the ferryboat Bryan.    However much he was an intruder on the boat, he was not an intruder on their premises when they put him off and would not bring him back, and they cannot hold him to the responsibility of being a trespasser on their incline and tracks if you find from the circumstances and situation of that incline and those tracks that it was a reasonable thing for him to be in and about those tracks, and a necessary thing for him to be in and about those tracks to get to the ferryboat Bryan."

To this the court added that he could not, on the other hand, be called a licensee:

"They did not," said the court, "in other words, license him to be over there, and give him a special privilege to go over their tracks and by their yard in order to get to the ferryboat Bryan; and I should not say, under the circumstances of this case, that he could be called a 'licensee.' He was neither a licensee nor a trespasser. He was an unfortunate man whom they refused to take across the river, and who had to go to another boat, and must pass over and across their tracks to do so, if you find the fact that way."

As to the measure of care required from the company towards so anomalous a man, the court said to the jury:

"Now, what duty did they owe him? He seems to suggest by his counsel that they owed him some sort of a special duty to look out for him while he was in their yard and on their tracks, because they had put him there. I do not think he can claim that position under the law. They were not under an obligation to issue an order: 'Look out for this man. We have put him off the transfer boat to go to the steamer Bryan. Keep a special lookout for him.' They were under no such obligation to him. But they owed to him that kind of reasonable care and diligence that every railroad company and every person running their engines would owe to a man found on their tracks without fault upon his part."

If this view was entertained upon the assumption that the direction given as to the way to the ferry landing operated to send the appellee through this dangerous yard, which might have been avoided, then his honor was mistaken as to the locus in quo. There was, at the then stage of the river, no way off the boat or premises of the railroad company that did not require the appellee to go through the yard and to the depot. When once there, he could turn to the left at the path or street which crossed the yard at that point, and thence west to the village, or he could turn to the right, and take the plankway down to the ferry. When the company discovered him thus intruding upon its boat, it had one of two things to do,—either to carry him over in violation of its rule, or to say to him, "Get off my boat, and get off my premises, and cross the river by the means open to you and all others." If it carried him over, which, of course, it was not bound to do, he would have been subjected to the same kind of danger in getting up the incline and through its yard on the Memphis side as that which confronted him on the west side. His case was like that of a man found trespassing in the center of his neighbor's premises. If ordered off, he must cross a portion of the premises to get off. Cook had so placed himself, of his own volition, that he was a trespasser where he was found, and must continue a trespasser until he could get off of the premises upon which he was intruding. To tell him where he could take the public ferryboat, and point out to him the way thereto, under the circumstances, did not operate as a license, and change the relation which he bore to the railroad company, or impose on it any duty which had not before rested upon it in regard to one who was on its premises without invitation, express or implied. The narrow embankment elevated above high water was covered with a network of railway tracks, at intervals connecting with each other. It was the place where trains were broken up, and outgoing trains made up. Engines and cars were

from the necessities of a great business in continual motion backward and forward, and passing from one track to another. The business of the company, the rapidity of transportation, the success with which that business should be conducted, and the dangerous character of the work required to be there done demanded that the business of such a yard should be surrendered to the company's own uses, free from any interference, and untrammeled by unnecessary restrictions upon the manner in which its trains should be there handled. That a straggling village lay behind this yard, and that, to reach the public ferry, it was necessary to cross the yard, cannot alter the case as to this appellee. At a street crossing other and different duties are imposed, by reason of the fact that the public and the railroad at public crossings have equal and reciprocal rights and duties. But these rights and duties at public crossings do not enlarge the public rights or extend the company's duties to points in its private yard not occupied as public streets. At the crossing the public had certain legal rights, but upon its tracks generally, and inside its switching yards especially, one uninvited has no legal right whatever. That this yard was uninclosed does not alter the question. We are not dealing with a case of premises exposed to the curiosity of persons incompetent to look out for themselves, or with the consequences to animals led by instinct upon an uninclosed and dangerous space. That this yard was private property, and was used for purposes which made its use as a walkway exceedingly dangerous, was a thing which any man competent to go without guardianship must be assumed conclusively to know. Upon such premises the plaintiff below had no business, no legal right, and necessarily was an intruder. Having no legal right to be where he was, the company stood in no such relation to him as it would to one at a street crossing, or to a passenger, or to an employé whose duty kept him in the yard. Aerkfetz v. Humphreys, 145 U. S. 420, 12 Sup. Ct. 835. It was negligence per se for one to intrude himself into such a place, and his presence there imposed no particular duty upon the company, except that general duty which every one owes to every other person to do him no intentional wrong or injury. Its liability for failing to discharge this duty can only arise when it becomes aware of the danger in which he stood. This switching yard was private property. In Nicholson v. Railway Co., 41 N. Y. 530, where the question was as to the legal right of a stranger to use the ordinary track of a railroad as a walkway, and who was injured by a collision with some cars which had been insufficiently secured and had broken loose, the court, concerning the liability of the company to one thus injured and the right of the company concerning the use to which it might put its own property, said: "It had the same unqualified right which every owner of property has to do with his own as he pleases, and keep it and use it where and as he pleases on his own ground, up to the point where such use becomes a nuisance." Where no statute affects the question, the railroad company is under no obligation, with reference even to its employés,

to keep a special lookout in its own yard, or to keep a bell ringing when an engine or train is in motion. Aerkfetz v. Humphreys, 145 U. S. 420, 12 Sup. Ct. 835. In the case last cited, the court said that "the ringing of bells and the sounding of whistles on trains, going or coming, and switch engines moving forward or backward, would have simply tended to confusion." Every one about such a yard as an employé or a trespasser must be taken to know the hazards of the situation, and that safety requires the utmost vigilance. The danger is apparent, and every instinct of self-preservation sounds a loud warning. Railroad Co. v. Moseley, 6 C. C. A. 641, 57 Fed. 921.

Plaintiff was not rightfully in the yard; his being there was negligence. The railroad company owed him no duty except to avoid, after discovering his danger, any wanton or unnecessary injury being done him.

In a case decided by the supreme court of Arkansas, it was said:

"The plaintiff being wrongfully upon the track, no duty arose in his favor until his presence was discovered, for the company had the right to run its trains without reference to the possibility that unauthorized persons might straggle upon its tracks. It was not bound to anticipate the intrusion. And, after he had been seen upon the track by the men in charge of the train, they might act upon the presumption that he would step aside in time to avoid a collision, unless it was so obvious that, owing to his condition or circumstances over which he had no control, he could not extricate himself from the danger which menaced him. The sole duty which the corporation owed to him was not wantonly or with reckless carelessness to run over him after his situation was perceived." Railroad Co. v. Monday, 49 Ark. 257, 4 S. W. 782.

The same rule was announced by this court in the case of Mississippi Val. Co. v. Howe, 6 U. S. App. 185, 3 C. C. A. 121, and 52 Fed. 362, where the question was as to the liability of the railroad to one of its employés who had gone to sleep upon its tracks. We cite a few of the many cases which support the view we have announced: Nicholson v. Railway Co., 41 N. Y. 525; Saldana v. Railroad Co., 43 Fed. 862; Railroad Co. v. Stroud, 64 Miss. 784, 2 South. 171; Railroad Co. v. Cocke, 64 Tex. 158; Railway Co. v. Garcia, 75 Tex. 591, 13 S. W. 223.

But if it be assumed that plaintiff was a licensee, and that the railroad company was guilty of negligence in not sooner discovering his presence, yet the negligence of the plaintiff, under the undisputed facts of this case, so grossly contributed to his own injury as to bar any recovery. In such a place he was under the highest obligation to exercise the utmost degree of vigilance in looking out for approaching engines or cars. Notwithstanding the appellee knew that he was in the midst of a network of tracks and switches, he did not, after being driven off of one track, take the slightest precaution to look out for a train coming on him from the rear. A train immediately followed the engine to which he had given way on the western track. The noise of its passage only made it the more important that he should use his eyes to see to it that no train ran on him from front or rear. If it be assumed that, when he crossed from one track to the other, he did look to the rear,

though this is not shown, yet he afterwards walked on straight ahead for from 20 to 30 yards, according to his own account, without looking behind him. The duty of one under such circumstances is not only to look each way on going upon a railroad track, but to continually exercise vigilance and observe the track behind as well as before. The duty of looking is a continuing one. Patton v. Railroad Co., 89 Tenn. 370, 15 S. W. 919. It is no answer to say that he did not expect that this engine, which had passed him on one track, would switch onto another track, and reverse its direction. In a yard full of tracks and switches, he had no right to take such a thing for granted. The case in this respect is totally unlike that of Patton v. Railroad Co., cited above. There the plaintiff stepped off the track to let a train pass him. When it had passed, as he supposed, he stepped back, and resumed his journey, without looking behind him. Within a few yards he was overtaken and run over by some cars which had broken loose from the train ahead, and were following through their own momentum. The court thought that, under such exceptional circumstances, the question as to whether the plaintiff was guilty of such a degree of contributory negligence as should bar his recovery might be submitted to a jury. Here the plaintiff was in a place where there was continuous movement, backward and forward. Switching from one track to another in the breaking or making of trains was to be anticipated by any man who was observant. "It can never be assumed that cars are not approaching on a track, or that there is no danger therefrom." Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85. The noises about him made it all the more important that he should not rely on his sense of hearing alone. Under the circumstances of this case, the failure of the plaintiff to watch his rear was gross negligence. Railroad Co. v. Moseley, 6 C. C. A. 641, 57 Fed. 921. It is true that questions of negligence and contributory negligence are ordinarily questions of fact to be passed upon by a jury; yet, when the undisputed evidence is so conclusive that the court would be compelled to set aside a verdict returned in opposition to it, it may withdraw the case from the jury, and direct a verdict. Elliott v. Railway Co., cited above; Railroad Co. v. Moseley, cited above; Aerkfetz v. Humphreys, 145 U. S. 420, 12 Sup. Ct. 835; Mississippi Val. Co. v. Howe, 6 U. S. App. 172–186, 3 C. C. A. 121, and 52 Fed. 362. "When the evidence leaves no doubt that, if the plaintiff had made any proper use of his senses, he could have both seen and heard, in due season, an approaching train, and thereby have avoided injury, the question is one of law, and not a question for the jury." Blount v. Railway Co., 9 C. C. A. 526, 61 Fed. 375. If but one inference can be legally drawn from the facts of a case, a direction for a verdict in accordance with that inference is proper. Horn v. Railroad Co., 6 U. S. App. 381, 4 C. C. A. 346, and 54 Fed. 301.

The request for a peremptory instruction should have been allowed. For this and the other errors we have indicated, the case must be remanded, with directions to award a new trial.