SPAVEN *v.* LAKE SHORE & MICHIGAN SOUTHERN RAILWAY CO. ·

1. INJURIES BY RAILROAD—PLACE OF SAFETY—STATION.

A railway company, which has provided a station room and platform for the use of those who have occasion to depart from and enter its trains, is not liable to a person who, before the arrival of the train, leaves the platform, and, while walking unnecessarily upon an adjacent track, is injured by a switch engine of another railway company.

2. SAME—CONTRIBUTORY NEGLIGENCE—WALKING ON TRACK.

Plaintiff, who had for two years been in charge of two semaphores and a joint switch at a railroad junction, after his day's work, waited at the junction station for a train to take him home. When his train was due he left the station, and, looking down the track, saw a headlight, which he thought was the train he expected. Knowing the train customarily stopped with the rear car at the station, he left the platform, and walked on a track 20 feet from and parallel with the one on which the train would arrive, for the purpose of entering a second-class coach next the engine, although there was ample space between the tracks for walking. Plaintiff knew engines were liable to run over the track at any time, but did not look back after stepping upon the track. After he had

gone 100 feet, a switch engine, without blowing its whistle or ringing a bell, ran him down. *Held,* that plaintiff was guilty of contributory negligence, and could not recover for the injury.

Error to Wayne; Hosmer, J. Submitted April 11, 1902. (Docket No. 32.) Decided May 19, 1902.

Case by John Spaven against the Lake Shore & Michigan Southern Railway Company and the Detroit, Grand Haven & Milwaukee Railway Company for personal injuries. From a judgment for defendants on verdict directed by the court, plaintiff brings error. Affirmed.

At the time of the accident upon which this suit is based, and for years prior thereto, the defendant companies operated jointly a double-track railroad extending from the Brush-street depot, in the city of Detroit, to Dequindre street, north on Dequindre street to a point about 200 feet north of Ferry avenue, where the trains of the Lake Shore diverge from the double tracks in a westerly direction onto the Lake Shore main line, the double track of the D. & M. continuing northward. The easterly main track was used by all trains going north, and the westerly main track by all trains going south. About 500 feet south of Ferry avenue there was a semaphore which controlled outgoing trains, and about 200 feet north of Ferry avenue there was a semaphore which controlled incoming trains. Between Ferry avenue and the semaphore on the south side there is a joint switch, used to switch trains over from the outbound track to the inbound track, and thence onto the Lake Shore main track. Just south of Ferry avenue a cross-over track connects these two tracks. About 250 feet south of Ferry avenue, on the easterly main track, is a switch which opens into the cross-over track. At the northerly end of the cross-over, where it connects with the inbound main track, there is another switch. An outbound Lake Shore train would come up

the easterly D., G. H. & M. main track to the switch first above named, would pass over it into the cross-over, out of the cross-over by the second switch upon the inbound track, along it a short distance, and then over the joint ·switch upon the Lake Shore track. After running a train length, plus the distance from that switch to Ferry avenue and the width of Ferry avenue, it would stop, with its rear car opposite the car-checker's shanty. To get it from the outbound D., G. H. & M. main track to its stopping place, the three switches had all to be opened and set for its passage. They were all fitted with switch lamps, which showed, to one looking down from Ferry avenue, white when the switches were set for the main lines, and red when they were set for the Lake Shore outbound train to make the station.

About 250 feet south of Ferry avenue, and just south of the joint switch, and westerly of the inbound track, there was a telegraph station, which was used by the telegraph operator and the person in charge of the joint switch and the semaphores, which were operated from this station by levers. West of the inbound track there was a long siding, commencing just south of the telegraph office, and extending south to Gratiot avenue and beyond. This siding was parallel with the main tracks, was connected with the inbound track at different points, and a number of spurs ran over in a westerly direction into different coal yards and other manufacturing establishments along the line, and were used for the purpose of switching cars upon the premises of the several establishments. On the north-west corner of Ferry avenue and the railroad track, and about 25 feet westerly from the inbound track, there was a small house used as a car-checker's office and a waiting-room for passengers. This point was known as the Lake Shore junction, and was used as a passenger station for many years, for the purpose of taking on and letting off passengers. All Lake Shore trains stopped at this point, and many of the trains of the D. & M. The outgoing trains would stop at this point so that the rear car would just

pass the north side of Ferry avenue. It was the custom of passengers to enter and leave the outgoing Lake Shore train on the easterly side, from which all signals were given by the conductor to the party in charge of the engine.

The plaintiff in this case had been in the employ of the defendant Detroit, Grand Haven & Milwaukee Railway Company for a number of years, in different capacities, and for two years prior to the accident had been in charge of the two semaphores and the joint switch at Ferry avenue, working from 6 o'clock a. m. until 6 o'clock p. m., standard time. He was well acquainted with the rules of the company, and knew the custom and manner in which trains were operated by both companies at this point. He lived in the western part of the city, and after quitting work it was his custom to take the 6:30 Lake Shore train to the west side of the city. He testified that he had done this every evening for a period of two years, and during all that time it had been his custom, upon the approach of the Lake Shore train, to walk up the inbound track almost to a point opposite the north semaphore, and there take the first passenger car behind the engine, being the second-class coach. This train stopped at this station only long enough to take on and let off passengers, the stop being momentary, and, in order to be sure of getting onto the train, it was necessary to be at the proper point on the train's arrival.

On the 26th day of December, 1896, plaintiff quit work at 6 o'clock, went over to the car-checker's office, and waited there until he saw the south semaphore go down. He looked at his watch. It was then 6:30 o'clock, and the Lake Shore train which he wished to take was then due. He went out of the car-checker's office, walked about 20 feet towards the inbound track, looked southward down the tracks, and saw a headlight on the outgoing main line, but said he did not see any engine or train south on the incoming main line. He then walked over onto the westerly or inbound track, and started towards the north semaphore, the point where he usually

entered the Lake Shore train. While he was walking along this track, and had proceeded a distance of about 100 feet up the track, a switch engine came up northerly on the inbound track, and, without blowing any whistle or ringing any bell, ran over the plaintiff, severing both legs.

There was about three or four inches of snow on the ground, the atmosphere was practically clear, there was an electric light at the intersection of Ferry avenue and the railroad crossing, and the headlight of the engine which struck him was lighted. The engine which ran over the plaintiff was engine No. 106, owned and operated by the Detroit, Grand Haven & Milwaukee Railway Company. This engine had been at work on the siding to the west of the inbound track, and south of the telegraph station, for 10 or 12 hours during that day. At some point south of the telegraph office this engine ran in upon the inbound track, and started northward towards the D. & M. junction, which is beyond the Lake Shore junction. This engine came out the inbound track at a speed, according to one of the witnesses, of about 12 miles an hour, and, according to others, at a speed of about 6 miles. The headlight which the plaintiff saw in looking down the track was the headlight, not of the Lake Shore train, but of a wild engine, which was coming out the outbound track, and it was for this engine that the semaphore was dropped, giving this engine the right to proceed on the outbound track. Plaintiff testified that he walked out the inbound track, relying upon the rules of the company, and his knowledge of their custom in the operation of trains at that point.

Rule 84*a* reads as follows:

" When double track is used, all trains will take the right-hand track, except as provided in special rules or orders, or when necessary to cross over to do work at stations when protected as provided in rule 100."

Rule 18 reads as follows:

"Trains or switch engines must use the right-hand track between the Lake Shore junction and double-track switch at Jefferson-avenue bridge, according to the direction in which they are running, and must keep careful lookout for switch engines, and approach cross-over switches under perfect control."

Rule 14 reads as follows:

"The track between the Lake Shore junction and Milwaukee junction will be considered yard limits for irregular trains and yard engines, and between Lake Shore junction and Leland street yard limits for yard engines only; but they must keep entirely clear of all time-card trains, and run very cautiously between those points, expecting to find main line occupied."

This rule controlled all switching crews.

Rule 2 provides:

"Enginemen approaching Lake Shore junction from Detroit will come to a full stop not less than 100 yards short of the double-track switch, and approaching Lake Shore junction coming towards Detroit will come to a full stop not less than 100 yards short of the joint switch, and remain until semaphore has been lowered and switch properly set, and signaled by switch tender to proceed, and will not pass the switches at a rate of speed exceeding four miles per hour.   It will not be necessary to lower semaphores on both sides of the switches,—only the one nearest to the train given the right to proceed.   The other semaphore must be kept up to stop trains coming in the opposite direction."

Rule 114b reads as follows:

"When within the limits of the various yards, all trains must be run with great care, and under the control of the engineman, so that he may at all times be able to stop within the range of his vision.   *   *   *"

The court directed a verdict for the defendants, holding, first, that the plaintiff was guilty of contributory negligence in being upon the track, and, secondly, that there was no gross negligence shown on the part of the defendant companies.

*Flowers & Moloney*, for appellant.

*Wells, Angell, Boynton & McMillan*, for appellee Lake Shore & M. S. Ry. Co.

*E. W. Meddaugh* (*Geer & Williams*, of counsel), for appellee Detroit, G. H. & M. Ry. Co.

GRANT, J. (*after stating the facts*). There is no evidence to show any liability on the part of the defendant the Lake Shore & Michigan Southern Railway Company. It had provided a station room and platform for those who had occasion to depart from and to enter its trains at Ferry avenue. In doing this it had done its full duty. *Sturgis* v. *Railway Co.*, 72 Mich. 619 (40 N. W. 914); *Michigan Cent. R. Co.* v. *Coleman*, 28 Mich. 452. The rear car stopped just opposite this platform. It extended no invitation to plaintiff or any one else to walk along the other track, or to use it as a platform for plaintiff or other passengers who desired to take its train. If it was necessary to walk to the front of the train instead of taking the rear car (there is no evidence to show such necessity), there was ample space between the two tracks, level and smooth, which the plaintiff might have taken. At the point where he was struck, the distance between the two tracks was 20 feet. Neither is there any evidence to show such a well-known custom on the part of passengers to walk down the other track so as to enter the smoking car,—the forward car of the train,—a distance of about 200 feet, as would bind the defendants.

Switch engines were liable to come in and go out over these tracks at any time. They were not limited to one track coming in and to the other going out. All they were required to do by rule 14 was to keep entirely clear of all time-card trains, and run cautiously between the points mentioned in the rule, as they might expect to find the main line occupied. Plaintiff is chargeable with notice that in this busy place these engines were liable to occupy the tracks at any time. He entered upon this track sup-

posing, as a matter of course, that the headlight he saw
was the headlight of the engine of the train which would
take the Lake Shore track. Evidently, had he looked
when upon the track on which he was injured, or within
10 feet of it, he would have observed that the engine was
upon the track. Furthermore, the switch lights were not
turned for the train to go upon the Lake Shore. Upon
this point he testified:

"I did not observe whether the switches, which were
within a few feet of me, were set so the train could get on
the Lake Shore. I was off duty. I did not bother my
head about it. That was left for the night man to look
after."

Two engines were, in fact, coming on defendants' tracks.
He did not look at any time after he had reached a dis-
tance of 20 feet from the inbound track. He testified that,
when within 20 feet, he could look about a half mile down
the track. He further testified:

"I was about 20 feet from the office when I looked to
the south and saw the headlight. I had gone about 20
feet towards the tracks when I looked to the south and
saw the headlight. I saw them coming that way, and I
turned myself and went up the track. At no point after
that did I look to the south to see if any train was coming."

That he knew of the extent of the switching appears
from his own testimony as follows:

"On account of all this switching and moving of trains,
engines may be passing there at any moment. They
were liable to be switching up there at any time. In the
winter time, especially, it is a busy place."

He further testified:

"I walked up the incoming main line because there was
snow shoveled away on the side of the track more than
anything else, and to keep out of the snow."

Plaintiff relied solely upon the fact that the semaphore
was dropped, and shut his eyes to all other evidences of
the facts surrounding him, and of which he might readily
have availed himself, showing that no train was coming

upon the Lake Shore track, but that a train was coming on the track over which he was walking. What right had he to assume that the engineer and fireman would look out for him any more than that he would look out for himself? Evidently the engineer and fireman were not at the moment looking. If this was negligence on the part of the engineer and fireman, was it not equally negligence for him to pay no attention to his surroundings? What right had he to rely upon the performance of duty by his fellow-servants,—if he was at that time in the employ of the company,—while he himself was neglecting to perform his own duty? Had they been looking, they would have had a right to suppose that he would step off the track in time to avoid injury. He does not testify that he did not hear the trains. On the contrary it is quite evident that he did hear them, and knew that one at least was coming behind him. It is difficult to conceive of a case of greater contributory negligence. Plaintiff went deliberately from a place of safety into a place of danger. *Kansas City, etc., R. Co.* v. *Cook*, 13 C. C. A. 364 (66 Fed. 115, 28 L. R. A. 181); *Wabash R. Co.* v. *Skiles*, 64 Ohio St. 458 (60 N. E. 576); *Trudell* v. *Railway Co.*, 126 Mich. 73 (85 N. W. 250, 53 L. R. A. 271); *Michigan Cent. R. Co.* v. *Campau*, 35 Mich. 468; *Bresnahan* v. *Railroad Co.*, 49 Mich. 410 (13 N. W. 797); 3 Elliott, R. R. § 1250.

The judgment is affirmed.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred. LONG, J., did not sit.