## ST. LOUIS & S. F. R. CO. v. WHITTLE et al.

(Circuit Court of Appeals, Eighth Circuit. April 17, 1896.)

### No. 633.

1. NEGLIGENCE—COMPARATIVE.

One W., with two companions, purchased tickets at a station of defendant's railroad, about 6 o'clock in the afternoon. The train which they were to take passed the station about midnight, and did not stop unless flagged, but defendant's station agent did not mention the latter fact. About midnight, the night then being very dark and misty, W. and his companions returned to the station. The agent had then gone to bed, and there were no lights at the station. A bystander volunteered to flag the train, and did so, with a match, but the train ran about 200 feet beyond the platform before stopping, at which point it could not be seen in the darkness. Another bystander then said to W. and his companions that they could go ahead and get on the train, and W. accordingly started up the track. The train had begun to back down, and ran over and killed W. on the track. The evidence was conflicting as to whether there were any lights on the rear of the train, and whether any signal was given before the train began to back down to the station. Upon the trial of an action brought by W.'s representatives against the railway company, the court instructed the jury that if they believed from the evidence that the defendant's employés operating the train could, by the exercise of reasonable care, have avoided killing W., notwithstanding

some negligence on his part, then W.'s negligence would not of itself prevent the plaintiffs' recovery. There was no evidence tending to show that any of the men on the train had reason to believe that W. was on the track when the train began to back up. *Held* that, in the absence of such evidence, the instruction given was erroneous.

2. CONTRIBUTORY NEGLIGENCE.

*Held*, further, that the fact that W. went upon the track, and walked or ran towards the train, without waiting to ascertain whether it would back down to the station, on a dark night, when he could not see the train, and had at least as much reason to suppose it would move back as forward, showed that he was guilty of contributory negligence, a conclusion not affected by the presumption arising from the instinct of self-preservation, and that the jury should have been instructed to find for the defendant. Caldwell, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Arkansas.

B. R. Davidson (L. F. Parker was with him on the brief), for plaintiff in error.

Ira D. Oglesby (John H. Rogers was with him on the brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This suit was brought by Bettie Whittle, Charlie Whittle, and Frank Whittle, the defendants in error, against the St. Louis & San Francisco Railway Company, the plaintiff in error, to recover damages on account of the death of W. L. Whittle, who was killed at Cameron, in the Indian Territory, on the morning of November 9, 1893, by being run over by one of the defendant company's passenger trains. The deceased, W. L. Whittle, was the husband of Bettie Whittle, one of the defendants in error, and the father of Charlie Whittle and Frank Whittle, the other defendants in error. The material facts on which the decision of the case depends do not admit of any dispute under the testimony preserved in the bill of exceptions, and they are as follows: The deceased, W. L. Whittle, resided with his family about four miles from the town of Cameron, in the Indian Territory. On the afternoon of November 8, 1893, he came to the defendant company's station in said town, in company with John E. Martin, and one Stewart, to take a train for Ft. Smith, Ark. Tickets for the intended trip were purchased of the defendant company's station agent about 5 or 6 o'clock p. m. of that day, but the train on which they expected to take passage was not due at the station from the south until about midnight. The train in question did not stop at Cameron unless it was flagged, but no notice to that effect was given to the deceased when he purchased his ticket. The deceased came to the station with his two companions, above named, a short time before midnight, and was standing on the station platform as the train approached from the south. The station agent had retired for the night before the train arrived, and there was no one present representing the defendant company to flag the train. For that reason, a bystander on the station platform, who knew that the deceased desired to board the train, lit a match, and waved it as a stop signal, when the engine was about 200 yards distant from the

center of the station platform. The signal was seen by the engineer, and responded to by two short blasts of the whistle, but, owing to its speed, the train ran past the station a short distance; so that, when it stopped, the rear end of the rear car was about 200 feet north of the north end of the station. The night was very dark and misty. There were no lights about the station except a dim light in one of the station windows. When the train came to a halt, one of the bystanders on the station platform remarked to the persons who were intending to board the train, "You can go ahead and get on," or words to that effect; whereupon Whittle, the deceased, stepped down from the platform onto the track over which the train had just passed, and started up the track to board the train, walking or running for that purpose between the rails. Very soon after the train stopped, the engineer reversed his engine, for the purpose of backing the train down to the station, and enabling those who desired to do so to get aboard. By the backward movement of the train, the deceased was caught on the track, and instantly killed, at a point a little north of the north end of the station platform. The evidence was conflicting as to whether there were or were not lights on the rear end of the train, and as to whether the engine bell was rung before the train started to back up. One of the plaintiff's witnesses, George W. Noble, who was standing on the station platform when the accident occurred, testified that he heard the puffing of the engine when the train began to back up. Another witness for the plaintiff, John E. Martin, who was a brother-in-law of the deceased, testified, in substance, that he had not left the platform when the accident occurred, and that he was not aware that the train had begun to move either backward or forward, after it halted north of the station, until he was made aware of the fact that the train was moving backward by the outcry of the deceased when he was run over.

Numerous errors have been assigned to the action of the trial court, but the view that we have felt ourselves constrained to take will only render it necessary to notice two of the alleged errors.

At the instance of the plaintiff below, the circuit court gave, among others, the following instruction; and the defendant company duly excepted thereto:

"The court further instructs the jury that it is not every negligent act on the part of deceased that amounts to such contributory negligence as would for that reason preclude plaintiff's right to recover. Although the jury may believe from the evidence that the deceased was guilty of some negligence, yet, if the jury believe from all the evidence that the defendant's employés operating the train by which the deceased was killed could, by the exercise of reasonable care and prudence upon their part, have avoided killing the deceased notwithstanding his negligence, then the negligence of the deceased of itself would not prevent plaintiffs from recovering in this action."

This instruction, as applied to the undisputed facts which were proven at the trial, was misleading, and therefore erroneous. There was no evidence before the jury tending to show that either the engineer, conductor, or any other trainman had any knowledge or reason to believe that the deceased was on the track in the rear of the train when it began to back up after it had run past the station.

In the absence of such evidence, the rule of law that was invoked by the plaintiffs had no application to the case in hand, and ought not to have been given. An instruction like the one now in question is very proper, no doubt, in those cases where it appears that a person negligently placed himself in a position of danger, and the fact became known to the alleged wrongdoer in time to have taken certain precautions to avoid injuring him, which were not taken. If an engineer in charge of a train sees a person walking on a railroad track, even at a place where he has no right to walk, he must, nevertheless, make all reasonable efforts to avoid injuring him. The fact that one person is guilty of negligence in placing himself in a dangerous situation does not absolve another person, when the fact becomes known, of the duty to make a reasonable effort to protect him from injury or from the consequences of his own carelessness. This principle is well established in the Law of Negligence, but it has no application except in those instances where the plaintiff's dangerous situation was known to the defendant, and the latter thereafter omitted some reasonable precaution which might have been taken, and which precaution, if taken, would have resulted in preventing the accident. In such cases it is the last omission of duty which the law esteems the proximate cause of the injury, and it accordingly permits a recovery by the injured party notwithstanding his prior negligence. Railway v. Monday, 49 Ark. 257, 4 S. W. 782; Railway Co. v. Cavenesse, 48 Ark. 106, 2 S. W. 505; Shear. & R. Neg. § 99, and cases there cited; Whart. Neg. § 323; Thomp. Neg. 1156. As we have before remarked, there was no testimony in the case at bar which tended to show that the trainmen either knew or suspected that the deceased had placed himself in a position where he might be run over and killed as the train backed up, and, in the absence of such proof, it was erroneous to instruct the jury on that hypothesis.

The circuit court further erred, we think, in refusing, upon the testimony contained in this record, to charge the jury as it was requested to do, that the deceased was guilty of contributory negligence, and that there could be no recovery for that reason. The testimony showed without contradiction that the deceased voluntarily placed himself in a position of great danger, by going upon the track, and walking or running thereon towards the train, without waiting even for a moment to ascertain if it would back down to the station. The night was dark and foggy; so dark in fact, as all the witnesses say, that it was impossible to tell, merely by looking, when the train began to move backward towards the station. If this be so, and if it is also true, as was contended by the plaintiffs below, that there were no lights on the rear end of the train, and insufficient light about the platform, these facts rendered the risks that were assumed by the deceased in walking or running up the track so much the greater. Besides, as the train had actually stopped in obedience to the stop signal, and as the deceased had not been invited or ordered by any of the trainmen or other employés of the railroad company to come forward and get aboard, he must have known that the train was at least as likely to move backward as to move forward, and to do so very soon. The danger to be ap-

prehended, therefore, from going on the track under these circumstances, was great and imminent.

It has been repeatedly held that a railroad track is itself a warning of danger, and that one who voluntarily goes or walks upon a railroad track without looking to see if a train is approaching when his view is unobstructed is, as a matter of law, guilty of a want of ordinary care, which precludes a recovery for an injury sustained, even though the railroad company itself was guilty of negligence. Such was the rule of law declared by this court, after a full consideration of the subject, in Railway Co. v. Moseley, 12 U. S. App. 601, 6 C. C. A. 641, and 57 Fed. 921, and in Railway Co. v. Bennett, 16 C. C. A. 300, 69 Fed. 525. See, also, to the same effect, Railroad Co. v. Houston, 95 U. S. 697; Schofield v. Railway Co., 114 U. S. 615, 5 Sup. Ct. 1125; Elliott v. Railroad Co., 150 U. S. 245, 14 Sup. Ct. 85; Bancroft v. Railroad Corp., 97 Mass. 275, 278; McGrath v. Railroad Co., 59 N. Y. 468, 472; Rodrian v. Railroad Co., 125 N. Y. 526, 26 N. E. 741; Mulherrin v. Railroad Co., 81 Pa. St. 366, 375. That shall be said, then, of the conduct of a person who voluntarily steps down on a railroad track from a station platform, and walks thereon towards a standing train that is liable to move backward or forward almost immediately, when it is too dark to see when it begins to move, or in which direction it is moving? It seems obvious to us that one who thus acts is equally as blameworthy as one who walks or drives across a railroad crossing without looking to see if a train is approaching, when he is able to do so. Even if we should concede, therefore,—and we are not disposed to controvert the proposition,—that the defendant company was at fault in not stopping its train opposite to the station, and in not providing sufficient lights about the depot platform, still the fact remains that after the train had passed the station, and the situation was well known to the deceased, he voluntarily placed himself in a dangerous position, which was not known to the trainmen, and, by so doing, directly contributed to his own death. The suggestion made to him or in his presence by the bystander, that he could go ahead and get on the train, was not in express terms, or by any fair legal intendment, a direction to walk up the track between the rails immediately in the rear of the standing train. By thus walking on the track, he incurred, as we think, an unnecessary and an obvious risk; and it admits of no doubt that, but for such act, the disaster would not have happened.

It has been suggested, arguendo, that the fact that all men possess the natural instinct of self-preservation constituted in itself some evidence which warranted the jury in finding that Whittle exercised due care, and so the case was properly submitted to the jury. The answer to this suggestion is that the testimony in this case discloses what the deceased did on the occasion of the accident. It shows that he committed an unnecessary and negligent act, without which the accident would not have occurred. For that reason there is no room for presumption or inferences based on the fact that men are generally moved by the instinct of self-preservation. It is doubtless true that a man's actions are usually prompted by a

natural desire to guard against injury to himself; but that this desire is not strong enough, on all occasions, to insure the exercise of reasonable care, is abundantly proven by our everyday experience that men will sometimes commit acts of negligence which imperil their own lives, as well as the lives of others. For these reasons we think that the argument last suggested is entitled, on the facts of this case, to little, if any, weight.

While the question of contributory negligence is ordinarily a question for the jury, yet it is a well established rule in the federal courts that when the facts are undisputed, and the proof of contributory negligence is so conclusive that the court would not sustain a contrary finding, it is its duty to direct a verdict for the defendant. No court is required to take the chances of a verdict being rendered which, if rendered, it would deem itself bound to set aside as wholly unsupported by evidence. Moreover, it is an undoubted right of an appellate court to determine, among other things, whether, upon the case as presented by the record, the trial court ought to have granted a peremptory instruction to find a verdict in favor of a particular party to the controversy. Gowen v. Harley, 12 U. S. App. 574, 6 C. C. A. 190, 197, and 56 Fed. 973; Railway Co. v. Moseley, supra; Elliott v. Railroad Co., supra; Schofield v. Railway Co., supra.

We think that the undisputed evidence contained in the present record shows that the deceased was guilty of an act of negligence, which directly contributed to his death. The judgment of the circuit court is therefore reversed, and the case is remanded, with directions to grant a new trial.

CALDWELL, Circuit Judge (dissenting). Whittle, Martin, and Stewart, three plain countrymen, living in the Indian Territory, went to Cameron, a station on the railroad of the defendant company, in that territory, to take the train for Ft. Smith, Ark. It does not appear that Whittle and his companions had any knowledge whatever of railroads or their mode of operation. They purchased tickets, and told the station agent they wanted to take the next passenger train to Ft. Smith, and were informed that it would pass the station about 12 o'clock midnight. The station agent did not acquaint them with the fact that the train did not stop at that station unless it was flagged. A little before midnight, Whittle and his two companions went to the station. It was a very dark night, and there was no light in the station, or on the platform, or anywhere about the station grounds or tracks. All was darkness. Besides Whittle and his two companions, there were on the station platform two other men, who were not going to take passage on the train, but were there upon other business, namely, Noble and Dr. Murray. The station agent went off to bed, and there was no agent of the company at the station or any place around to flag the train or give any advice or information to Whittle and his companions as to how to stop the train, or how or where they should get on after it did stop. When the train was seen approaching, Dr. Murray volunteered to flag it, and did so, with a lighted match. The

train ran past the station a distance of two or three hundred feet, and stopped. It had no lights on the rear end. After it stopped, the whistle was not sounded, the bell was not rung, and no signal was given to indicate which way it was moving. The train could not be seen after it stopped, by the persons on the platform, nor could its backward movement on the track be heard or seen by them. From the noise made by the escaping steam, which was the only noise heard after the train stopped, Mr. Noble, a druggist and an intelligent man, living in the town, and presumably having some knowledge of the manner in which trains on this road were managed and operated at this station, and certainly more knowledge and experience on the subject than Whittle and his companions could possibly have, was under the impression that the train would not back up to the platform from the point where it stopped, but would go forward from that point to Ft. Smith; and he says: "I made the remark to them [Whittle and his companions], if they would run, they could get on the train." Acting upon this advice of Mr. Noble, and believing the train would not back up, but was going forward, the three men started in the darkness in the direction of the train, Whittle in the lead, and were immediately lost to view in the darkness. In a brief space of time, Whittle gave a cry of anguish or alarm, and was soon found under the train, crushed to death. It turned out that Whittle, in the darkness, had in some manner gotten onto the railroad track; and the train, backing up towards the station, noiselessly, and without lights or signals of any kind, had run over and killed him. Just where he got onto the track, or how long he had been there, no one knows, because, in the darkness, no one could see his movements. There were bales of cotton, railroad ties, timbers, and other obstructions on either side of the track going in the direction of the train, which, in the intense darkness of the night, made it difficult, if not impossible, for any one to go in anything like a straight line to the train without following the track. In consequence of these obstructions, the track, at this point, was commonly used by the public in going to and from the station.

The plaintiff's testimony establishes the foregoing facts, and they must be accepted by this court as true in determining whether there is sufficient evidence to support the verdict of the jury. The plaintiff's evidence tending to support it must be taken as true, and the conflicting evidence disregarded, for it is the exclusive province of the jury to pass upon the credibility of the witnesses. The appellate court cannot weigh or balance the evidence. The rule is, therefore, well settled, and has been frequently announced by this court, that when, by giving credit to the plaintiff's evidence, and discrediting that of the defendant, the plaintiff's case is made out, the court cannot withdraw the case from the consideration of the jury, or set aside their verdict. Railway Co. v. Phillips, 13 C. C. A. 315, 66 Fed. 35; Railroad Co. v. Teeter, 27 U. S. App. 316, 11 C. C. A. 332, and 63 Fed. 527; Railroad Co. v. Conger, 12 U. S. App. 240, 5 C. C. A. 411, and 56 Fed. 20; Railway Co. v. Sharp, 27 U. S. App. 334, 11 C. C. A. 337, and 63 Fed. 532. The jury found that the railroad company was guilty of culpable negligence, and that Whittle was

not guilty of contributory negligence, and returned a verdict in favor of the plaintiffs. The majority of this court have set aside the verdict of the jury, upon the ground that Whittle was guilty of such contributory negligence as to preclude his widow and children from recovering for his death.

There were present on the station platform, that night, five persons, namely, Whittle, Martin, Stewart, Noble, and Dr. Murray. Whittle was killed, and, before the trial of the case, Dr. Murray had left the country, and Stewart was not called as a witness; so that, of those five who alone had any opportunity to know what the persons standing on the station platform saw or heard, Martin and Noble, only, were called as witnesses.

Martin testifies in part as follows:

"Q. After the train stopped this side of the depot, the first stoppage, the first time it stopped, I will ask you whether or not there were any signals given of any kind there, either bell or whistle or lanterns, or anything of that kind. A. No, sir; there were not. Q. There was no whistle? A. No, sir. Q. No bell? A. No, sir. Q. And no waving of a lantern or anything of that kind on the train? A. No, sir. Q. No signals of backing of any kind? A. No, sir. Q. When did you first ascertain as a matter of fact that that train was backing? When did you first learn it was backing? A. When it struck Mr. Whittle. Q. When Mr. Whittle holloed, was it? A. Yes, sir. Q. Was the train moving when you run up and spoke to the engineer? A. Yes, sir. Q. When could you first see the moving train? A. When I got right even with the train, of course I could tell it was moving back. Q. Could you hear it until it got even with you? A. No, sir; I never heard the train; it was backing. * * * Q. State whether or not you could see, when you were on the platform, where the train was. Was there anything to indicate where the train was that you could see? A. I could not see the train when I was on the depot when it stopped. Q. Could you see it when Whittle holloed or yelled? A. No, sir; I could not. * * * Q. When it started back, you say there was no noise. You could not hear it until you got along even with the train after you run up there? A. Yes, sir; I got right at the train before I heard it. Q. How close did you get to it before you could see it? A. Well, I was right by the train; the train was running by me when I noticed it."

On cross-examination the same witness testified as follows:

"Q. You tell this jury that you looked to see whether you could see that train or not after it had passed you? A. Yes, sir. Q. You looked to see whether you could see it or not? A. Yes, sir. Q. Did you see it? A. No, sir. Q. You didn't see it? A. No, sir. Q. You heard it stop; you heard the noise cease, and knew it had stopped, did you not? A. Yes, sir; I heard the noise cease, and supposed the train had stopped. * * * Q. And you didn't hear the noise of the train until you got even with it? A. Well, right about the train."

Mr. Noble testifies:

"Q. When the train stopped up on the track,—that is, stopped at first,—what was done by these three parties? I am talking about Stewart, Martin, and Whittle? A. I made the remark to them, if they would go on now, they could get on the train. Q. What did they do? A. They started. Q. Who was ahead? A. I don't remember. Q. Did they all start? A. That is my recollection. * * * Q. Could you see the rear end of the train when you first heard Whittle hollo? A. No, sir. * * * Q. After the train stopped, I will ask you if it made any signal of backing; that is, either by ringing the bell, blowing the whistle, or swinging of any lantern, or anything of that kind. A. I never saw or heard any. Q. Is your hearing good? A. Yes, sir. * * * Q. Did you know when it stopped? A. Yes, sir. I could tell about when it stopped. I don't know exactly the time it stopped, but I

could tell about. Q. You could tell when the noice ceased? A. Yes, sir. Q. Was that when you made the remark that you can now go ahead and get on? A. Yes, sir. * * * Q. Did you hear the moving of the train? A. I don't remember about that, whether I heard the noise of the train or not. Q. But didn't you look down the road towards the train after it had passed by the depot? A. Yes, sir. Q. And you could not see anything that indicated where the train was? A. No. sir. Q. You could not see the red lights, or did not see them? A. I did not see them. Q. You say you heard the train puffing. Did you say that it puffed more than once? A. Yes, sir; exhausted. Q. More than once? A. Yes, sir. Q. How many times did you hear that? A. Oh, several times. I don't remember how many times. Several times though. Q. While you were on the platform? A. Yes, sir. Q. What called your attention to that fact, now? A. My impression was at the time that the train was going this way [towards Ft. Smith], and I made the remark to them, if they would run, they could get on the train. Q. You heard the train moving, then, before you made that remark, and you were under the impression it had started on towards Ft. Smith? A. Yes, sir; as soon as I found the train had passed and stopped, I made the remark to them, if they would hurry or run, they could get on the train. Q. You stated a while ago that you heard it puff, and you thought it was starting towards Ft. Smith? A. Yes, sir; I just remember that my impression was that, if they would start, they could get on the train, and that suggested to me that the train was going on this way [towards Ft. Smith]. Q. You heard the puffing just as a train that was starting? A. Yes, sir; I supposed it had just started."

These are the only witnesses who were on the station platform that night who testified to what the persons standing on the platform saw and heard and believed with reference to the movements of the train. But their testimony is not all of the evidence which the jury had a right to take into consideration in determining whether Whittle was guilty of contributory negligence. Whittle's death itself testifies against the wanton and reckless negligence on his part which must be shown to defeat a recovery in this case.

In Railroad Co. v. Nowicki, 46 Ill. App. 566, the court said:

"While it is true that, in an action for personal injuries based upon the negligence of the defendant, it is an essential element of the plaintiff's case that the injured party must have been in the exercise of ordinary care, yet it is not indispensable that such fact should be directly shown by affirmative evidence. There is in all men a natural instinct of self-preservation, and such instinct is an element of evidence of which the jury may take notice, and, in the absence of all testimony upon the subject, find that a deceased party, in obedience to the ordinary instincts of mankind, exercised that care for his safety which a prudent man would, under the same conditions, have made use of."

"The natural instinct," says Agnew. J., in Allen v. Willard, 57 Pa. St. 374, 380, "which leads men in their sober senses to avoid injury and preserve life, is an element of evidence. In all questions touching the conduct of men, motives, feelings, and natural instincts are allowed to have their weight, and to constitute evidence for the consideration of courts and juries."

And see, to the same effect, McGhee v. White, 13 C. C. A. 608, 66 Fed. 502; Gilchrist v. Eustrom, 16 C. C. A. 421, 69 Fed. 794.

This rule of evidence has been twice announced and acted upon by the supreme court of the United States.

In Railroad Co. v. Griffith, 159 U. S. 603, 610, 16 Sup. Ct. 105, the court said:

"Since the absence of any fault on the part of a plaintiff may be inferred from circumstances, and the disposition of persons to take care of themselves, and to keep out of difficulty, may properly be taken into consideration (Rail-

road Co. v. Gladmon, 15 Wall. 401), it is impossible to hold, in the light of this evidence, as matter of law, that the conduct of plaintiff was such as to defeat a recovery."

It is perfectly clear upon the evidence that neither Whittle, nor any other man on that platform that night, saw or heard anything to indicate that the train was backing up, or that it would back up. He was sober and in the full possession of his senses, and it is incredible that he knowingly and intentionally ran against a moving train which he saw or heard. He was struggling over the rubbish and through the darkness, to reach the train which Noble had told him was moving out for Ft. Smith. Why should he be convicted of negligence in not seeing and hearing what the other persons situated exactly as he was neither saw nor heard. The law does not hold men responsible for a knowledge of acts unless their ignorance arises from some fault or negligence of their own. The witnesses agree that it was so dark that the train itself could not be seen until one was "right up to it." If a train of cars could not be seen, how could Whittle see the rails on the railroad track, or know whether he was on the railroad track or not? The truth is that he was lured to his death by the most gross and culpable negligence on the part of the railroad company. That negligence consisted in a variety of acts. It was the duty of the railroad company to have the station platform lighted, and it was not lighted at all. When the station agent closed the ticket office for the night, and went off to bed, he turned down the wick of the lamp in the office so low that the fact that the lamp was lighted at all was barely discernible when looking at it through the office window. It was not left lighted for any purpose of lighting the office, much less the platform, but so that a light might be quickly made by turning up the wick, instead of having to light it with a match. It shed no light on the platform. The company owed Whittle the further duty of having an agent awake and at his post to seasonably flag the train, so that it might stop at the platform, or, if it failed to do so, to impart to him such information as might be necessary to enable him to get on the cars in safety. If the station agent had been there to flag the train at the proper time, it would have stopped at the platform. The company, having negligently permitted the train to go by the platform, was guilty of gross negligence in backing it up to the station on a dark night, without having any light or signal on the rear car, and without blowing the whistle or ringing the bell or giving any signal whatever of its approach. If the station agent had been at his post, and had flagged the train in due time, or if the train had stopped at the station platform, or if, when it ran by, the station agent had been there to give information as to its future movements, or if the train could have been seen, or there had been lights on the rear end, or the bell had been ringing or the whistle blowing, or the station platform or grounds had been lighted up so the rails and track could have been seen, a different question would have been presented; but the railroad company negligently failed to perform a single one of these duties. It is quite foreign to the case, therefore, to cite authorities to show that one who knows he is on a railroad

track, and who is wrongfully there, and who can readily see and hear a coming train, may be held guilty of contributory negligence. A railroad company owes to its passengers a much higher duty than it owes to trespassers on its track, or even to persons crossing its track at public highways. To its passengers it owes the absolute duty of providing them a safe passage to and from the cars, and passengers · have a right to rely upon the discharge of this duty by the company. Railway Co. v. Johnson, 59 Ark. 122, 26 S. W. 593, and cases cited. If Whittle was on the track, he was there unwittingly, and because of the acts of negligence of the railroad company which justified him in seeking the train, and the railroad company will not be heard to complain that he did not foresee and provide against its numerous acts of gross negligence. Webb's Pol. Torts, 592. "It is not necessarily and of itself contributory negligence to do something which, apart from the state of things due to the defendant's negligence, would have been imprudent." Id. 593.

But it is said, suppose the railroad company was guilty of all the acts of negligence charged, "these facts render the risks that were assumed by the deceased so much the greater." But it was the railroad company that imposed these risks upon Whittle, and it cannot shift the consequences of them on him. The reasoning seems to be that if there was no light on the rear car, and no signals given, and it was so dark the plaintiff could not see the train on the track, he ought not to have proceeded to hunt up the train at all without a light. The railroad company cannot take advantage of its own wrong in this manner. It is liable for the damages resulting from the risk its misconduct compelled Whittle to run if he acted as a reasonably prudent man would have acted under the same conditions. That he did so act is proved beyond all reasonable doubt by the fact that every man on that platform believed he was doing a proper thing to follow up the train. His two companions did the same, and that they did not share his fate is owing to the fact that he was in the lead. Noble advised all of them to do it. It makes no difference that Noble was not an agent of the company. His advice shows what a reasonably prudent man thought was proper to be done under the circumstances. That Whittle, amidst the obstructions and in the darkness, got onto the railroad track, was not his fault, but the direct result of the multiplied negligent acts of the railroad company.

A contention like that made by the majority of the court in this case was made in Low v. Railroad Co., 72 Me. 313, 321, and the court answered it in this wise:

"The defendant's counsel put the dilemma thus: 'If the night is light enough to see the gangway, no railing or light is necessary to enable a person to avoid it; and, if the night is too dark to allow of its being seen, then a person groping around in the dark, and unconsciously walking into it, is guilty of such negligence as to preclude him from recovering.' But if this plausible statement is absolutely correct, there never can be an accident of this description for which the injured party can recover. The idea seems to be that there is no necessity for any precaution on the part of the wharf owners, because constant vigilance on the part of those who come there when it is light enough to see the danger will enable them to avoid it; and, duty or no duty, they must not come without a light in the nighttime, or they

will be set down as wanting in ordinary care, and so forfeit their right to protection or compensation. The argument establishes, if anything, too much. The questions are not of a character to be disposed of by a little neat logic. They are rather, as remarked by the court in Elliott v. Pray, 10 Allen 384, 'questions which can be best determined by practical men on a view of all the facts and circumstances bearing on the issue.' No such sweeping syllogism as this presented by defendant's counsel can be adopted as a rule of decision."

In Railroad Co. v. Van Steinburg, 17 Mich. 99, 118, Judge Cooley, delivering the opinion of the court, said:

"Negligence, as I understand it, consists in a want of that reasonable care which would be exercised by a person of ordinary prudence under all the circumstances in view of the probable danger of injury. The inquiry is therefore one which must take into consideration all these circumstances, and it must measure the prudence of the parties' conduct by a standard of behavior likely to be adopted by other persons of common prudence. * * * Thus, the problem is complicated by the necessity of taking into account the two sets of circumstances affecting the conduct of different persons; and it is only to be satisfactorily solved by the jury placing themselves in the position of the injured person, and examining those circumstances as they then presented themselves to him, and from that standpoint judging whether he was guilty of negligence or not. It is evident that such a problem cannot usually be one upon which the law can pronounce a definite sentence, and that it must be left to the sifting and determination of a jury."

The judgment of this court in Railway Co. v. Sharp, 27 U. S. App. 334, 11 C. C. A. 337, and 63 Fed. 532, is directly in point in this case. In that case it was claimed that the plaintiff was guilty of contributory negligence by driving on the railroad track after night, when he heard a locomotive puffing not far from the crossing. This court said:

"He heard no sound but the puffing of the locomotive. The bell was not ringing, and the whistle was not blowing. There was no flagman at the station, and no light there or elsewhere between the two switch lights, and nothing could be seen on the track between the locomotive and the crossing; and, satisfied that he could cross the track in safety before the locomotive could reach the crossing even if it was coming towards him, he started to do so. His horse crossed the track in safety, but the hind end of his cart was struck by a moving flat car, and he received the injuries complained of. It turned out that the locomotive was pushing three or more flat cars towards the crossing, which, owing to the darkness, the plaintiff could not see, and which he did not hear, and which had no light or flagman or other agency on them to give warning of their approach. We are unwilling to lay it down as a rule of law that the plaintiff was negligent in not anticipating the particular act of negligence of the defendant which occasioned the accident. Hutchinson v. Railway Co., 32 Minn. 398, 21 N. W. 212; Weller v. Railway Co. (Mo. Sup.) 23 S. W. 1061. The jury, by their verdict, have said that the plaintiff was not required to conjecture or surmise that the company would attempt to back a train of flat cars, which made little or no noise, over a public crossing, in the suburbs of a city, on a dark night, without a brakeman or a light or other signal on them to warn the public of their coming; and we concur in that conclusion."

In Staal v. Railroad Co., 57 Mich. 239, 23 N. W. 795, the court said:

"Whether the moving forward [to cross the railroad track] as it was done was culpable negligence must depend on what Staal was bound to anticipate. In the absence of any knowledge of what was passing in his mind, we cannot hold him conclusively at fault, unless there is no sensible explanation to the contrary reasonably possible."

A case in point is that of Hartwig v. Railway Co., 49 Wis. 358, 5 N. W. 865. On a stormy, dark night the train stopped further from

the station than usual. The plaintiff asked the night watchman who was at the depot, whether he had to walk that far back to get on the caboose, and the watchman replied, "I guess you have." The plaintiff then started to the caboose, and, on his way, fell into an open cattle guard between the tracks, and was injured, and it was held that the railroad company was liable.

It is said Whittle should have anticipated the backing of the train, because that is what is customarily done when a train runs by the station. That may be so with a well-regulated railroad which is operated with a due regard to the public convenience and safety. But all the testimony shows that the management of this railroad at that station on that night falls far below the standard of a well-regulated railroad. Even the backing up to the station resulted from a mistake of the engineer in supposing he had a signal to back up, when he had none. He testifies that the conductor did not give him any signal to back up, and that he did not see the conductor give the fireman such a signal, but that he thought he saw the fireman give him a signal to back:

"I thought the fireman did, but he says he didn't. * * * Q. The motion you say was the usual signal? A. Yes, sir; what I thought was the usual signal. Q. But since that you say he has told you— A. Yes, sir; he told me he did not give the signal."

And so Whittle is declared guilty of culpable negligence, because he did not anticipate that, through a mistake of the engineer in interpreting a movement of the fireman, the train would be backed up to the platform on that night! Whether Whittle knew what the practice of a well-regulated railroad was in this respect we have no means of knowing. So far as anything is disclosed by this record, this railroad was the first and only one Whittle ever saw, and his knowledge of its conduct and management was derived from what he saw and learned at that station on that night. From that observation and experience, neither Whittle nor any one else could have the least expectation that anything would be done by that road, on that night, at that station, according to the rules of a well-regulated railroad. Certain it is that nothing was so done. The quality of Whittle's action must be judged by the special circumstances and surroundings at the time and place. We must place ourselves in his position, and look at the circumstances and surroundings as they presented themselves to him, and say whether his action was such as might be expected of a man of common prudence and intelligence under similar circumstances. The question is not whether his act would have been prudent at another time, and at a well-lighted station upon another railroad, which was being operated with some regard to the convenience and safety of its patrons. It is obvious the accident would not have occurred at such a station and upon such a road. Nor was Whittle bound to exercise all the care a judge schooled in the law of contributory negligence, and having in mind the lessons it teaches, would probably exercise. That standard of care would be much too high to impose on mankind generally. If he behaved as a plain countryman of common prudence and intelligence would have done under all the circumstances then sur-

rounding him, the law acquits him of negligence. Who so capable of deciding whether his action came up to this standard of care as men who are themselves plain sensible men of common prudence and intelligence, and who will bring to the solution of the question their own common sense and practical knowledge and experience?

It is indisputable that the question of contributory negligence is one of fact for the jury. When it is said that a given act constitutes negligence in law, the statement means no more than that, in the judgment of all reasonable men,—not judges alone,—it would be esteemed such. The expression "negligence in law" has come into common use, but it is not to be inferred therefrom that the judges are endowed with the power and authority to declare what acts shall constitute negligence or due care, for these are questions of fact, which it is the exclusive province of the jury to determine. Judges are presumed to be possessed of common knowledge and understanding, and when their common knowledge enables them to say that by the consensus of public opinion, by the uniform judgment of all reasonable men and the uniform verdict of juries, a given act is an act of negligence, they have a right to say that the rule as to that act must be regarded as settled. But they say this, not because it is their opinion, but because it is the opinion of all reasonable men; and, if it is not the opinion of all reasonable men, they are not authorized to say it. In Railroad Co. v. Van Steinburg, supra, Judge Cooley said:

"The case, however, must be a very clear one which would justify the court in taking upon itself this responsibility; for, when the judge decides that a want of due care is not shown, he necessarily fixes in his own mind the standard of ordinary prudence, and, measuring the plaintiff's conduct by that, turns him out of court upon his opinion of what a reasonably prudent man ought to have done under the circumstances. He thus makes his own opinion of what would be generally regarded as prudence a definite rule of law. It is quite possible that, if the same question of prudence were submitted to a jury collected from the different occupations of society, and perhaps better competent to judge of the common opinion, he might find them differing with him as to the ordinary standard of proper care. The next judge trying a similar case may also be of a different opinion, and, because the case is not clear, hold that to be a question of fact which the first has ruled to be one of law. Indeed, I think the cases are not so numerous as has been sometimes supposed in which a judge could feel at liberty to take the question of the plaintiff's negligence away from the jury. This question was very fully and carefully considered by the supreme court of Connecticut, in Beers v. Railroad Co., 19 Conn. 566, and a rule was laid down, which has since been followed in that state, and is very succinctly stated in Park v. O'Brien, 23 Conn. 347, as follows: 'The question as to the existence of negligence, or a want of ordinary care, is one of a complex character. The inquiry, not only as to its existence, but whether it contributed with negligence on the part of another to produce a particular effect, is much more complicated. As to both, they present, from their very nature, a question, not of law, but of fact, depending on the peculiar circumstances of each case, which circumstances are only evidential of the principal fact,— that of negligence or its effects,— and are to be compared and weighed by the jury, the tribunal whose province it is to find facts, not by any artificial rules, but by the ordinary principles of reasoning; and such principal fact must be found by them before the court can take cognizance of it, and pronounce upon its legal effect.' It is a mistake, therefore, to say, as is sometimes said, that when the facts are undisputed the question of negligence is necessarily one of law. This is generally true only of that class of cases where a party has failed in the performance of a clear legal duty."

The issue between the members of this court is clearly defined. On the one hand it is maintained that it is for the court to determine whether the acts of Whittle, under all the special and peculiar circumstances surrounding the case, constitute contributory negligence in law; and the contention on the other hand is that whether those acts constitute contributory negligence is a question of fact for the jury, and not of law for the court. The question is not to be obscured by confounding it with the generality of cases in which, if there is either no evidence or not sufficient evidence to warrant a verdict, the court may take the case from the jury for want of evidence. This case is not one of lack of evidence. The contention of the majority is not that there was no evidence to go to the jury, but that the facts proved constituted contributory negligence in law. The contention of the minority is that it is the province of the jury to determine what constitutes contributory negligence from the proven facts. It would be an affectation of learning to cite the hundreds of cases in this country and in England which hold this question is one for the jury. In addition to the cases already cited I content myself with citing two or three of the judgments of the supreme court of the United States on this question. The position of the majority is expressed in the following sentence in their opinion:

"We think that the undisputed evidence contained in the record shows that the deceased was guilty of an act of negligence which directly contributed to his death."

Against this assumption of the majority that it is their province to decide upon the facts proved whether the "deceased was guilty of an act of negligence," I interpose the clean-cut and emphatic declaration of the supreme court of the United States that:

"Although the facts are undisputed, it is for the jury, and not for the judges, to determine whether proper care was given, or whether they established negligence." Railroad Co. v. Stout, 17 Wall. 657.

In Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, the lower court, in its charge, told the jury:

"You fix the standard for reasonable, prudent, and cautious men under the circumstances of the case as you find them, according to your judgment and experience of what that class of men do under these circumstances, and then test the conduct involved, and try it by that standard; and neither the judge who tries the case nor any other persons can supply you with the criterion of judgment by any opinion he may have on that subject."

And the supreme court held this was the law, and affirmed the judgment. In the same case the supreme court said:

"It is earnestly insisted that although the defendant may have been guilty of negligence in the management of its train, which caused the accident, yet the evidence in the case given by the plaintiff's own witnesses shows that the deceased himself was so negligent in the premises that, but for such contributory negligence on his part, the accident would not have happened. * * * To this argument several answers might be given, but the main reason why it is unsound is this: As the question of negligence on the part of the defendant was one of fact for the jury to determine under all the circumstances of the case, and under proper instructions from the court, so, also, the question of whether there was negligence in the deceased, which was the proximate cause of the injury, was likewise a question of fact for the jury to determine, under like rules."

In Jones v. Railroad Co., 128 U. S. 443, 9 Sup. Ct. 118, the lower court instructed the jury to render a verdict for the defendant upon the ground that the plaintiff had been guilty of contributory negligence, but the supreme court reversed the judgment, saying:

"But we think these questions [of negligence] are for the jury to determine. We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as this as well as others."

The supreme court of the United States has twice referred approvingly to the case of Sullivan v. Railroad Co., 154 Mass. 524, 28 N. E. 911. In Railway Co. v. Ives, at page 432, 144 U. S., and page 688, 12 Sup. Ct., the court say:

"The substance of the case is stated in the syllabus by the reporter[1] as follows: 'Plaintiff, a woman about 65 years of age, of ordinary intelligence, and possessed of good sight and hearing, was injured at a railroad crossing. The railroad had been raised several feet higher than the sidewalk, and the work of grading was still unfinished, and the crossing in a broken condition. There were three tracks, and a train was approaching on the middle one. The view was obstructed somewhat with buildings, but, after reaching the first track, it was clear. The evidence showed that the plaintiff was familiar with the passing of trains; that she did not look before going upon the track; and that, if she had looked, she could have seen the train a quarter of a mile. When the whistle sounded, she looked directly at the train, and hurried to get across. Plaintiff testified that she looked before going upon the track, but did not see the train or hear the whistle; that the only warning she had was the noise of its approach, after she was on the first track; and that she did not then look to see where it was, or on which track it was coming, but started to cross as fast as possible, and, in so doing, stumbled, and fell between the rails. The signals required by the statutes were not given. *Held*, that it did not appear as matter of law that plaintiff was guilty of gross or willful negligence, and that it was proper to submit the question to the jury."

In Railroad Co. v. Everett, 152 U. S. 107, 14 Sup. Ct. 474, it is said:

"In Sullivan v. Railroad Co., 154 Mass. 527, 28 N. E. 911, it was held that 'the court is not permitted to take from the jury these questions of negligence and to decide them for the jury and for the case, unless the evidence shows that the negligence of the defendant in error was gross and willful. If it was less than that, then the questions of negligence were for the jury, and are all settled in favor of the defendant in error by the verdict."

Probably the clearest and most comprehensive statement of the rule is found in Railway Co. v. Ives, supra, where the court say:

"There is no fixed standard in the law by which the court is expected to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence

---

[1]As published in 28 N. E. 911.

or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered one of law for the courts."

In the case at bar, 16 men—12 jurymen and 4 judges—have been called upon to draw a conclusion from the same evidence. Of this number, the 12 men appointed by the constitution to be the exclusive triors of the question 'have found that Whittle was not guilty of contributory negligence, and the learned and experienced trial judge and one member of this court have found that the testimony abundantly supports the verdict of the jury, and two judges of this court are of a different opinion. The rule of the supreme court is that, unless "all reasonable men" would draw the conclusion that the party was guilty of contributory negligence, the verdict of the jury must stand; but the majority of the court have substituted for the rule of the supreme court a rule which, if put into words, would read that if, out of 16 reasonable men, 2 can be found who draw conclusions different from the 14, the verdict of the 2 shall prevail over that of the 14. But this statement of the new rule falls far short of illustrating the extent of the invasion of the functions of the jury in this case; for I hazard nothing in saying that a fair and impartial jury cannot be found in this circuit, of 11 states, who would not, upon the evidence in this record, return the same verdict that was returned by the jury that tried this case.

The degree of proof required to establish contributory negligence must not be overlooked. The rule is "that the evidence against the plaintiff must be so clear as to leave no room to doubt, and all material facts must be conceded or established beyond controversy." Field, Dam. 519; Beach, Contrib. Neg. § 447; Railway Co. v. Sharp, 27 U. S. App. 334, 11 C. C. A. 337, and 63 Fed. 532, and cases cited. Juries are the constitutional triors of the facts, and it is their exclusive province to decide what facts are proved. "It is a point too well settled to be now drawn in question that the effect and sufficiency of the evidence are for the consideration and determination of the jury." U. S. v. Laub, 12 Pet. 5. "Whether evidence is admissible or not is a question for the court to decide; but whether it is sufficient or not to support the issue is a question for the jury." Bank v. Guttschlick, 14 Pet. 19, 31. The court in Ewing v. Burnet, 11 Pet. 41, 51, said: "It is the exclusive province of the jury to decide what facts are proved by competent evidence." In Richardson v. City of Boston, 19 How. 263, the court said: "If there be 'no evidence whatever,' as in the case of Parks v. Ross, 11 How. 362, to prove the averments of the declaration, it is the duty of the court to give such peremptory instruction. But, if there be some evidence tending to support the averment, its value must be submitted to the jury, with proper instructions from the court. If this were not so, the court might usurp the decision of facts altogether, and make the verdict but an echo of their opinions." In Chandler v. Von Roeder, 24 How. 224, the court said: "Whether there be any evidence is a question for the judge; whether there be sufficient evidence is for the jury." In Gregg v. Moss, 14 Wall. 564, Mr. Justice Miller, speaking for the court, said: "The brief of the plaintiff proceeds to argue

that the evidence before the jury does not sustain either of the allegations of advancing the money to the partnership, or the agreement of the plaintiff to convert it into capital of the partnership. With this we can have nothing to do. It was the province of the jury to determine whether either of these allegations was proved."

This was the unquestioned doctrine in all the courts for the first half century of the existence of the government. It is only in recent times, and since corporations have absorbed the capital and business pursuits of the country, that a tendency has developed, in some courts, to impinge on the functions of the jury and the constitutional rights of suitors. This invasion of the functions of the jury is attempted to be justified upon the ground that juries are prejudiced against corporations, and that it is the duty of the courts to protect them from such prejudice. This is an unfounded assumption. The danger to life and property growing out of the management and operation of railroads has been greatly lessened in recent years, and this improvement is largely due to the verdicts of juries. Corporations formed for pecuniary profit act from pecuniary considerations alone, and it was not until it became obvious that it was cheaper to incur the expense necessary to give greater security to life and property in the operation of their roads than it was to pay the damages awarded by the verdicts of juries, for negligently failing to provide reasonable safeguards, that railroad companies exercised more care, and adopted better and safer methods, for the operation of their roads. Juries whose intelligence and impartiality are impugned have no opportunity to be heard in their own defense. If they were accorded an opportunity to answer this charge of the judges against them, they would probably content themselves with a reference to the "mote" and the "beam," with an earnest asseveration that the beam was not in their eye.

As illustrating the proper regard to be paid to the verdict of juries by appellate courts, I refer to Johnson v. U. S., 157 U. S. 320, 15 Sup. Ct. 614. This was a capital case, and the supreme court conceded that, in the view they took of the evidence, there "was room for a reasonable doubt of the defendant's guilt." This concession would, of course, have compelled the court to set aside the verdict of the jury if it was the court's opinion of the evidence, and not that of the jury, which was to prevail. They did not set aside the verdict, however. The court said: "The impression has been made upon us, by our examination of the evidence, that there was room for a reasonable doubt of the defendant's guilt. But," say the court, "the jury that found him guilty saw and heard the witnesses, and we must infer from the conduct of the court in overruling the motion for a new trial that it was satisfied with the verdict." And, notwithstanding their impression of the evidence was different from that of the jury, they refused to set aside the verdict, affirmed the judgment, and the defendant was hanged. Why should the verdict of a jury be held more inviolable when a man's life is in the scale, than it is when only a money liability of a railroad company is in the scale? A verdict should be as conclusive upon an artificial as upon a natural person. There should be no discrimination.

Without pursuing the subject further, I refer to and reaffirm what is said by this court in Railroad Co. v. Ellis, 10 U. S. App. 640, 4 C. C. A. 454, and 54 Fed. 481, and in the dissenting opinions in Laclede Fire Brick Manuf'g Co. v. Hartford Steam Boiler Insp. & Ins. Co., 19 U. S. App. 510, 9 C. C. A. 1, and 60 Fed. 351, and Finalyson v. Milling Co., 14 C. C. A. 492, 67 Fed. 507, on the subject of the respective functions of the court and jury.

The ruling of the majority of the court holding that, upon the evidence, Whittle was guilty of contributory negligence, is an invasion of the province of the jury, and a denial to the plaintiffs of their constitutional right to have the facts of their case tried by a jury.