HART v. NORTHERN PAC. RY. CO. †

(Circuit Court of Appeals, Eighth Circuit.   March 30, 1912.)

No. 3,680.

1. TRIAL (§ 139*)—QUESTIONS OF LAW OR FACT—DIRECTION OF VERDICT.

If there is any substantial evidence of a contradictory character on any decisive or material issue in the case, the weight and probative force of that evidence is for the jury, but if there is no substantial conflict in the proof, nor in the fair and reasonable inferences deducible therefrom, or the evidence clearly preponderates in favor of one party, then a question of law is raised for the court.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341, 365; Dec. Dig. § 139.*]

2. RAILROADS (§ 283*)—PERSONS ON TRACK—CARE REQUIRED—"NEGLIGENCE."

A railroad track in active use is per se a warning of danger, admonishing every one that a train is liable to pass over it at any time, and no one, whether passenger, licensee, or trespasser, can approach such a track so near as to be hit by a passing train without first both looking and listening to ascertain whether a train is approaching which might injure him, nor can he frequent or walk over a private railroad yard covered by many tracks, employed constantly for through travel, switching, etc., without looking and listening and exercising the utmost degree of vigilance; the term "negligence" under such circumstances meaning the want of such care as ordinarily prudent persons usually exercise under similar circumstances.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 283.*

For other definitions, see Words and Phrases, vol. 5, pp. 4743–4763; vol. 8, pp. 7729–7731.]

3. NEGLIGENCE (§ 82*)—CONTRIBUTORY NEGLIGENCE.

One whose injury or death is occasioned by negligence of his own which in any degree proximately contributes thereto cannot recover in the national courts from another whose negligence also contributed to such death or may have been the primary cause thereof, since one cannot un-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied July 1, 1912.

reasonably expose himself to danger, inspired by expectation of remuneration for a consequent injury from any one who may have contributed to that injury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 112–114; Dec. Dig. § 82.*]

4. RAILROADS (§ 383*)—PERSONS ON TRACK—DEATH.

Decedent, a drover, having reached a junction point at night, and desiring to go to the stockyard office some distance west of the passenger depot, started to walk toward the west in the space between the main line track and a switch track adjoining. There was a row of freight cars on the switch track, so that, in case a train passed on the main track, there was only about two feet between the end of the pilot beam as the engine passed and the side of the freight cars. Decedent had been warned that a passenger train was due to pass at any time, and, notwithstanding there were 50 feet of open space in plain view before him on the opposite side of the main line over which he could have walked in safety, he continued to walk along the space with his back to the approaching train, paying no heed to it. When the engine was about to strike him, he seemed unconscious of its approach, because, while his companions crowded to the side of the freight cars to allow the engine to pass, he took no precautions, and, on a startling outcry of warning by others, he had time only to glance in the direction of safety before he was struck and killed. *Held*, that he was negligent as a matter of law.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1305–1310; Dec. Dig. § 383.*]

5. RAILROADS (§ 401*)—PERSONS ON TRACK—DEATH—DISCOVERED PERIL.—PLEADING.

Where, in an action for death of a pedestrian while walking along a railroad track, the complaint charged that defendant was negligent, in that it operated the train by which decedent was struck at a high rate of speed and failed to give any signal of its approach, charging that the accident was caused "solely" by reason of such acts of alleged negligence and "not otherwise," and there was no other allegation raising the issue of discovered peril, and no attempt was made to raise such issue by amendment, plaintiff could not successfully claim that the court erred in failing to submit such issue to the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1382–1390; Dec. Dig. § 401.*]

6. NEGLIGENCE (§ 83*)—CONTRIBUTORY NEGLIGENCE—DISCOVERED PERIL.

Liability of a railroad company for death of a pedestrian walking along the track, notwithstanding the decedent's contributory negligence, does not arise under the doctrine of discovered peril, unless defendant's servants actually knew of decedent's peril, and thereafter failed to exercise ordinary care to avoid injuring him.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 115; Dec. Dig. § 83.*]

7. RAILROADS (§ 400*)—PERSONS ON OR NEAR TRACK—DEATH—DISCOVERED PERIL—QUESTION FOR JURY.

In an action for death of a pedestrian while walking along a railroad track by being struck by a train approaching him from the rear, evidence *held* insufficient to justify the submission of the issue of discovered peril to the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1365–1381; Dec. Dig. § 400.*]

8. APPEAL AND ERROR (§ 1056*)—EVIDENCE—PREJUDICE.

Where decedent, who was killed in defendant's railroad yard by being struck by a train approaching him from the rear while he was walking along a railroad track, was negligent as a matter of law and therefore could not recover, he was not prejudiced by the exclusion of a rule of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

railroad company requiring that all trains must approach and pass through the yards under full control.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4187–4193; Dec. Dig. § 1056.*]

In Error to the Circuit Court of the United States for the District of North Dakota.

Action by John L. Hart, as administrator of the estate of Chester B. Starr, deceased, against the Northern Pacific Railway Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Francis B. Hart (Thomas D. Schall, on the brief), for plaintiff in error.

N. C. Young (Ball, Watson, Young & Lawrence, on the brief), for defendant in error.

Before SANBORN, ADAMS, and CARLAND, Circuit Judges.

ADAMS, Circuit Judge. This suit was instituted by the plaintiff below to recover, on behalf of the next of kin and heirs at law of Chester B. Starr, damages suffered by them by the alleged negligence of the defendant in so operating one of its trains of cars as to cause his death. The act of negligence complained of in the petition was that the defendant caused one of its west-bound passenger trains to be propelled over its main track in its yards in the city of Jamestown, N. D., "at a high, unlawful, reckless, careless, and negligent and dangerous rate of speed without any notice, signal, or warning to said deceased," who was as alleged "lawfully standing in between said main track of said defendant and the said side track next north thereof," and thereby did "violently strike said deceased in the back, and hurl him forcibly into the air, and cause said deceased to be thrown violently against a box car standing on said side track." The complaint further stated that, "solely on account of the said unlawful, negligent, and careless running of said train at a high, dangerous, careless, negligent, and unlawful rate of speed without due regard to the safety of the said deceased, and on account of the negligence and carelessness of said defendant in failing to give said deceased any warning, notice, or signal of the approach of said passenger train, and through and by reason of no fault or negligence on the part of said deceased, and not otherwise, said deceased was struck by said passenger train and hurled thereby as aforesaid," as a result of which he died. The answer denied the negligence as alleged, and affirmatively pleaded contributory negligence by the deceased. On these issues the cause was tried to a jury, and, at the close of all the evidence, the learned trial judge on motion of defendant's counsel instructed the jury to return a verdict for the defendant. Assigning that action of the court as the main reversible error, the plaintiff brings this case here for review.

The facts of the case as disclosed by the record appear to be practically uncontroverted. They are as follows: Plaintiff's intestate on June 18, 1910, shipped two car loads of live stock from Goodrich, N. D., to Chicago, billed over defendant's branch line known as "Sike-

ston Branch" from Goodrich to Jamestown, and thence over its main line to point of destination. The freight train over the branch road arrived at Jamestown stockyards a little after 7 o'clock in the evening, where it had to be broken up, the stock watered, and the cars for Chicago placed in a through train going east over the main line.

The stockyards extending westwardly from the Jamestown passenger depot, a distance of about two miles, had a business or yard office located on the main line about three-fourths of a mile west of the passenger depot. The main line, on which all the traffic both freight and passenger was carried, ran through this yard east and west, and north of it and substantially parallel to it were 14 side tracks used for receiving and storing cars and making up freight trains; the first of these, called track No. 1, was about nine feet away from and parallel to the north rail of the main line. South of the main line were 3 tracks, the first of which, leading to the roundhouse, was about 50 feet from and substantially parallel to the main line connecting with it at a lead switch about 900 feet east of the yard office. South of track No. 1 were 2 other tracks. South of these was a public highway and south of it was a restaurant. The roundhouse was about 700 feet west or southwest of the yard office, and beyond it westwardly were the stockyards. Seventy feet east of the yard office on the main line was a water tank, 800 feet east of the water tank was the lead switch which took the engines off to the roundhouse, and 3,470 feet east of the water tank was the Jamestown passenger depot.

Soon after the arrival of the freight train from Goodrich at the stockyards, a west-bound passenger train, No. 5, arrived at the depot where it had to change engines before it proceeded westward through the yards. Its engine had been cut off and sent to the roundhouse, and the passenger train was waiting for another engine to pull it out on its west-bound trip. A line of freight cars stood north of the water tank on track No. 1, to which Mr. Starr's cars, which were then at the stockyards, were soon to be coupled. In this condition of things Mr. Starr, who had just come into the yards with his two cars of stock, and his helper, a man by the name of Blazing, came to the yard office, and inquired whether they would have time to get supper before their train would be made up and pull out easterwardly. They were informed they would have time, and were then told that the train their cars would be attached to was then being made up on track No. 1. A drover by the name of Dell, who had brought a car of live stock over the Sikeston Branch Road which was billed also for Chicago, having already had his supper, went down to the stockyards to attend the watering of Mr. Starr's stock as well as his own, while Starr and his helper were getting their supper. Dell had also been informed of the location of the train which was to take out their stock and of the time of its departure. While he was attending to the stock at the yards, Starr and Blazing returned to the yard office. Blazing sat down on the platform, and Starr walked down the narrow passageway between the main line and track No. 1, in an easterly direction, to a point near the water tank where the yardmaster was

at work, and sought to engage him in some conversation, when he was told by him that he could not talk there; that, if there was any further business he wanted to see him about, it would have to be done at the office. The record discloses that one or two other men whose identity is not made known were walking about with Starr. At about this juncture Mr. Nelson, the conductor, who was to take out the stock train then being made up on track No. 1, passed along in a westward direction, checking up his cars, and Starr asked him how soon the stock train would move out, and he answered, "As quick as we can get ready;" and Nelson then told him, in substance, that he had better look out for No. 5 which was soon coming. The yardmaster then started for the office, followed by Mr. Starr and the others. As they were walking westwardly toward the office in the narrow way between the main line and the freight cars standing on track No. 1, the passenger train No. 5, from Jamestown, came along running at a rate of speed estimated at about 25 miles per hour, and Starr was hit by the projecting end of the pilot beam, and thrown against a freight car standing on track No. 1, and received injuries from which he subsequently died. The others who were with him got close up to one of the freight cars and escaped injury, but according to all the proof Starr walked along apparently paying no attention to what was behind him until some shouting or signal startled him, when he suddenly threw up his face to the north, and was hit. The engineer of the passenger train testified that he saw Starr and three other men walking westwardly ahead of his train, between the main track and the first track on the north, for a distance of over one-quarter of a mile, but that he did not realize until he was within about 60 feet of Starr, that the latter was not cognizant of the approach of the train and was not going to get out of the way of danger, and that he then by outcry and otherwise did all in his power to avoid collision with him, but was unsuccessful in doing so. There was evidence tending to show that the engineer blew his whistle and sounded his bell as he approached the water tank, and there was evidence to the contrary. Mr. Dell, the drover who was accompanying Starr, testified that he was on his way eastwardly from the stockyards nearly opposite the roundhouse, a distance of some 300 or 400 feet west of the yard office, when train No. 5 approached and the accident occurred, and that his vision of the train was totally obscured by steam which enveloped the track. If there was any such enveloping steam, it could only have come from some one of the engines which were in the yard. Dell's testimony was uncertain from what engine this steam emanated, and there was much evidence that the blowing off of steam from an engine on a clear evening like that of June 18th could produce no such result as Dell testified to. All the other witnesses in the case, consisting of four, who were produced by plaintiff, and five who were produced by defendant, unequivocally contradicted Dell's testimony on the subject, and unanimously affirmed that the view of the approaching train was clear and unobstructed from the yard office eastwardly to the depot, on the evening in question, and there is no pretense that the track was not straight all the way from the yard office to the depot.

[1] The question is whether on this state of facts the Circuit Court erred in directing a verdict for the defendant. In answering this question, we shall recognize and apply the proposition of law last affirmed by this court in the case of Franchina v. Chicago, Burlington & Quincy R. R. Co., 195 Fed. 462, 115 C. C. A. ——, just decided, that, if there be any substantial evidence of a contradictory character on any decisive or material issue in the case, the weight and probative force of that evidence is for the jury, and not for the court, to consider and apply, and, on the contrary, if there be no substantial conflict in the proof or in the fair and reasonable inferences deducible from it, a question of law only is raised for the court, and that is, which party is entitled to a judgment thereon, and this the court alone must decide.

There was much discussion at the bar and in the briefs of counsel pro and con on the question whether there was any legal obligation primarily resting on the Railroad Company to give any signal of the passing of its trains through its own yards at Jamestown, and, also whether any such signal was, in fact, given. This involved and received an able consideration of the relationship of the deceased to the Railroad Company; that is, whether he was a passenger, licensee or trespasser at the time and place when he received the fatal injury. But, in the view we take of the issue of contributory negligence presented by the pleadings, it will be unnecessary and unprofitable to devote time or attention to either of those questions.

[2, 3] There are certain propositions of well-established law applicable to the facts of this case which must be recognized and applied. Among them are these: (a) That a railroad track in active use is per se a warning of danger and that any one is thereby admonished that a train is liable to pass over it any time. (b) That no one, whether passenger, licensee, or trespasser, can approach a railroad track so near as to be hit by a passing train without first both looking and listening to ascertain whether a train is approaching which might injure him. And a fortiori (c) that no one, whether passenger, licensee, or trespasser, can frequent or walk over a private railroad yard covered by many tracks employed constantly for a variety of purposes like through travel, switching, breaking up and making up trains without scrupulously observing the precaution just alluded to, and otherwise exercising the utmost degree of vigilance in looking out for approaching engines and trains. Kansas City, Ft. S. & M. R. Co. v. Cook, 13 C. C. A. 364, 66 Fed. 115, 28 L. R. A. 181; Garlich v. Northern Pac. Ry. Co., 67 C. C. A. 237, 131 Fed. 837; Chicago, R. I. & P. Ry. Co. v. Baldwin, 90 C. C. A. 630, 164 Fed. 826. Great is his peril, and proportionately great should be his effort to protect himself therefrom. Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361. The foregoing are not only injunctions imposed by the law of the land, but they are so plainly the dictates of common prudence that no one attempts to gainsay them. Again, the law of the national courts and of the state courts when unaffected by local statutes is that one whose injury or death is occasioned by negligence of his own, which in any degree proximately contributed to it, cannot recover from another whose negligence also

contributed to it or whose negligence may have been the primary cause of it. One cannot unreasonably expose himself to danger, inspired by any expectation of remuneration, for a consequent injury, from any one who may also have contributed to that injury. Sound public policy forbids this. (d) The term "negligence" as involved in this case means the want of such care as ordinarily prudent persons usually exercise under similar circumstances.

[4] Bearing these familiar principles in mind, we have to inquire whether there was any substantial conflict in the evidence on the issue whether Mr. Starr exercised ordinary care for his own safety, which required consideration by the jury. In other words, we must consider the conclusiveness of the evidence as to whether he, by his own negligence, in any way directly contributed to his injury. He knew not only presumptively that a train might come along at any time, but he and his companions knew as an actual fact that passenger train No. 5 from the Jamestown depot would be along soon. Of this he had been expressly warned. Possessed of this knowledge, while there were 50 feet of open space in plain view before him on the south of the main line over which he could have walked back to the yard office in perfect safety, he chose the narrow space between the main line and the row of freight cars on track No. 1, which, according to the proof, would leave only about two feet between the end of the pilot beam as the engine passed and the south side of the cars. Not only so, but in spite of his warning he sauntered along towards the office with his back towards the approaching train, paying no heed to it whatever. Even when the engine was about to strike him, he seemed utterly unconscious of its approach, and, when his companions betook themselves to the side of the freight cars to allow the engine to pass in safety, he took no precaution of that kind, but, upon some startling outcry of warning by others, he had time to only glance in the direction of safety before he was hit.

So much for affirmative evidence of want of ordinary care. But there was more than this. The physical and uncontradicted facts are to the same effect. He could not have looked or listened or otherwise made any use of his senses to discover the approach of the train behind him. If he had done so at any time after the train started from the Jamestown depot, he could not have avoided seeing or hearing it. It is inconceivable that he could have paid any attention to it as it approached nearer and nearer to him. If he had done so, he must have both seen and heard it. If, after seeing and hearing its close approach, he made no effort to avoid being run over by it, he certainly was not in the exercise of ordinary care. But we are here met with the contention that the steam which witness Dell testified about so obscured his view that, if he had looked, he could not have seen the approaching engine. Nine witnesses, including four whose credibility plaintiff vouched for, by calling them, and five others who were experienced in such matters and who stood at the time of the accident on the open platform of the yard office or just east of it, all testified that there was no cloud of steam or anything else which interfered with their perfect vision eastwardly even so far back as the Jamestown depot. With this array of testimony directed to the very point and

place of inquiry, the testimony of Dell who stood at the time between
300 and 400 feet west of the yard office, to the effect that some cloud
of steam obscured his vision eastwardly, is not necessarily inconsistent
with that of the other witnesses. One, at least, of the engines about
the yards was located in a southwesterly direction from the yard office,
which, if Dell was correct in saying that the steam came from an en-
gine blowing off, might have projected its steam across the line of his
vision west of the yard office; and this would not have been incon-
sistent with the testimony of the other nine witnesses that there was
no impediment to vision between the yard office where they stood, east-
wardly to the depot at Jamestown. Whether this be so or not we do
not think Dell's evidence creates such a substantial conflict with that
of the other nine witnesses as warranted a submission of the issue of
contributory negligence to the jury.

In Southern Pacific Co. v. Pool, 160 U. S. 438, 16 Sup. Ct. 338, 40
L. Ed. 485, the Supreme Court, in passing upon a similar question to
that now before us, said:

"There can be no doubt where evidence is conflicting that it is the province
of the jury to determine, from such evidence, the proof which constitutes
negligence.   There is also no doubt, where the facts are undisputed or
clearly preponderant, that the question of negligence is one of law."

The Supreme Court had before that time in repeated cases held that
the court might withdraw a case from the jury and direct a verdict
for the plaintiff or the defendant where the evidence was undisputed,
"or of such conclusive character that the court, in the exercise of a
sound judicial discretion, would be compelled to set aside a verdict
returned in opposition to it."

In the early case of Improvement Co. v. Munson, 14 Wall. 442, 448,
20 L. Ed. 867, that court distinctly disapproved of the "scintilla doc-
trine," saying:

"But the recent decisions of high authority have established a more rea-
sonable rule [than the scintilla rule] that in every case, before the evidence
is left to the jury, there is a preliminary question for the judge, not whether
there is literally no evidence, but whether there is any upon which a jury
can properly proceed to find a verdict for the party producing it, upon whom
the onus of proof is imposed."

In Herbert v. Butler, 97 U. S. 319, 320, 24 L. Ed. 958, Delaware,
etc., Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213,
Elliott v. Chicago, Milwaukee & St. Paul Ry., 150 U. S. 245, 14 Sup.
Ct. 85, 37 L. Ed. 1068, and Patton v. Texas & Pacific Ry. Co., 179
U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, the court reaffirmed the
doctrine of the Munson Case, but no criterion was suggested for de-
termining what evidence was of such "conclusive character" as to
warrant the summary action of the court in directing a verdict. In
view of that fact the Pool Case becomes peculiarly instructive. It
is there said: Where the facts are "undisputed or clearly pre-
ponderant" the question of negligence becomes one of law. We
have heretofore in the cases of Chicago & N. W. Ry. Co. v. Andrews,
64 C. C. A. 399, 130 Fed. 65, Patillo v. Allen-West Commission Co.,
65 C. C. A. 508, 131 Fed. 680, 686, followed the doctrine of the Pool
Case, and held that under circumstances like those of the present case

it was the duty of the trial court to treat the question involved as one of law and not of fact. See to the same effect the very recent case of Chicago Junction Ry. Co. v. King, 222 U. S. 222, 32 Sup. Ct. 79, 56 L. Ed. ——, decided December 11, 1911, and also Mt. Adams, etc., Inclined Ry. Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463.

Dell's testimony, therefore, to the effect that his vision 300 or 400 feet west of the yard office when looking in the direction of the Jamestown depot was obscured by steam, constitutes no substantial contradiction to the testimony of the nine other witnesses that their vision at or east of the yard office was not obscured at all.

Contention is made in considering the issue of contributory negligence that Starr's conduct should be measured and adjudged by his environments, in the light of the confusion arising from his alleged beclouded vision, the escape of steam, and all other facts and circumstances surrounding him; and our attention is called to the case of Kain v. Northern Central Railway, 128 U. S. 91, 9 Sup. Ct. 16, 32 L. Ed. 339; Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 433, 12 Sup. Ct. 679, 36 L. Ed. 485. The principle so invoked is undoubtedly sound and the facts referred to have been taken into consideration in reaching our conclusion on this issue. They disclose that Starr's environment was not such as precluded the exercise of ordinary care by him, and that on the undisputed proof in the case he failed to exercise it.

[5] Argument is next made that there was sufficient evidence to go to the jury on the question whether, after the defendant discovered Starr's actual peril, it failed to exercise ordinary care to avoid running over him. This is an issue not made by the pleadings, or, so far as we can discover, ever called to the attention of the trial court. It presupposes or concedes the existence of contributory negligence, and seeks to avoid its consequence by subsequent occurrences. If it were true that Starr was in a state of actual peril, that the defendant had actual knowledge of that peril, and after that knowledge was acquired failed to exercise ordinary care to prevent injuring him, these facts might create a cause of action or might excuse the contributory negligence which brought Starr into his position of peril. St. Louis & S. F. R. Co. v. Whittle, 20 C. C. A. 196, 74 Fed. 296; Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 558, 11 Sup. Ct. 653, 35 L. Ed. 270; Chunn v. City & Suburban Ry. Co., 207 U. S. 302, 28 Sup. Ct. 63, 52 L. Ed. 219, and cases cited.

On this subject we took occasion in the recent case of St. Louis & S. F. R. Co. v. Summers, 97 C. C. A. 328, 173 Fed. 358, to say:

"The rule is well settled that, notwithstanding such contributory negligence of a traveler in crossing a railroad track as precludes recovery for the primary negligence of the railroad company in operating its train so as to bring about a collision with him, yet another and different cause of action arises in favor of the traveler if for any reason he is exposed to eminent peril and danger, and the railroad company, after actually discovering that condition, could, by the exercise of ordinary care, have stopped its train, or otherwise have avoided injuring him, and failed to do so. [Cases cited.] But in the application of this rule care must be taken to avoid undermining the rule of contributory negligence. Such negligence of the traveler in law fully exonerates the railroad company from the consequences of its original

negligence, and some new and subsequent act of negligence must arise to create a cause of action; and this new or secondary act must be established by proof, unaided by the former acts, which have been excused by the traveler's contributory negligence."

The difference between a cause of action for the primary negligence and one for the secondary negligence referred to in that case is striking. In the first case, the defendant would be liable if by the exercise of reasonable care he ought to have known or anticipated plaintiff's danger and failed to exercise ordinary care to avoid injuring him, but such liability would be defeated if the plaintiff in any way directly contributed to his own injury.

[6] In the other case no liability would arise unless the defendant actually knew of plaintiff's peril, and thereafter failed to exercise ordinary care to avoid injuring him; but in such case the defensive effect of the original contributory negligence would be entirely eliminated.

In the case now before us no suggestion is found in the pleading of any issue of this last-mentioned kind. The charge in the complaint already pointed out is that defendant's negligence consisted of the high rate of speed at which it operated its train and the failure to give any signal of its approach. According to the pleading, it was "solely" by reason of these two acts of alleged negligence, "and not otherwise," that the deceased was struck and killed. After defendant's answer was filed setting up Starr's contributory negligence as a defense, no attempt was made by amendment of the complaint or otherwise to avoid its effect by pleading the facts now insisted upon as an exoneration.

Defendant's counsel contend that they should not now for the first time be called upon to meet this new issue. In this we think they are correct. The essential difference between the facts creating the cause of action now relied on and the facts declared on in the complaint demanded that they should be stated either in separate suits or in separate counts of the same suit. In this way only could the defendant have been fairly advised of the charge it was to meet and enabled to prepare a defense to it.

[7] In the present case, however, there does not seem to have been sufficient evidence of knowledge by the defendant's agents of Starr's actual peril or sufficient evidence that they failed to exercise ordinary care for his safety after such knowledge came to them, as would have, if the last-mentioned issue had been properly tendered, warranted a submission of it to the jury.

The cases of Missouri Pac. R. Co. v. Moseley, 6 C. C. A. 641, 57 Fed. 921, and Chicago & N. W. Ry. Co. v. Andrews, supra, present in many respects substantial parallelisms to the facts of this case. They are referred to as persuasive, if not controlling, of the conclusion now reached.

[8] There is an assignment of error predicated upon the exclusion by the Circuit Court of a certain rule of the defendant company to the effect that all trains must approach and pass through the yards under full control. In the view we have taken of this case, if the exclusion of that rule was error (which we do not decide), it was error without

prejudice. The contributory negligence of plaintiff's intestate was fatal to plaintiff's right of recovery, however negligent the defendant may have been.

Finding no error in the trial below, the judgment is affirmed.