Vidal, Plaintiff and Appellant, v. Porto Rico Railway, Light & Power Co., Defendant and Appellee.

Appeal from the District Court of San Juan, Section 2, in an Action for Damages.

No. 2592.—Decided February 18, 1924.

Damages—Intoxication—Negligence—Contributory Negligence—Trespasser. —Plaintiff's deceased met his death while entirely under the influence of liquor and lying on the ground with his legs across one of the rails on the right of way of the defendant. The evidence tended to show that at the time of the accident the place where he was lying and was killed by the defendant's car formed no part of the public street by custom, dedication or otherwise; that there was no crossing at the place; that the public had no particular occasion to cross the track there, and that there were few houses in that particular neighborhood. *Held:* That the deceased was a trespasser and that at an unfrequented spot on its right of way a tramway company is under no duty to keep a lookout for trespassers.

The facts are stated in the opinion.

*Mr. M. Benítez Flores* for the appellant.

*Messrs. J. H. Brown* and *P. Amado Rivera* for the appellee.

Mr. Justice Wolf delivered the opinion of the court.

The record tends to show that Carlos Aguado y Vidal met his death in a state of intoxication; that while entirely under the influence of liquor he was lying on the ground with his legs across one of the rails on the right of way of the electric tramway known as the Porto Rico Railway, Light and Power Company, the defendant in this case; that he was killed by a car of the defendant company while his legs were so lying across the track. There was no evidence tending to show that the spot where the accident occurred was frequented by the public. On the contrary, the evidence tended to show that the place in question at the time of the accident formed no part of the public street by custom, dedication or otherwise; that there was no crossing at the spot in question and the public had no particular occasion to cross the track there, and that there were few houses in that particular neighborhood. In short,

it was a place where there was no reason to apprehend the presence of a person on the track. At a very short distance before reaching the spot of the accident the street crosses a causeway or embankment, curves and then goes in a slight ascent for a short number of meters. The court found that, after rounding the curve, the motorman, had he been vigilant, could have seen the legs of the deceased thirty or thirty-five meters ahead of the place of collision and in time to have stopped the car.

We may say that there was some evidence tending to show that at the date of the accident, differentiated from the date of the trial, a pile of stones somewhat obstructed the view of the motorman. The record shows that some. photographs of the spot were taken contemporaneously with the accident and admitted in evidence. An exception was reserved to the admission of these photographs. Nevertheless, they form no part of the evidence transcribed.

The court found, in substance, that defendant was guilty of negligence in failing to keep a lookout but that the complainant could not recover because the deceased was guilty of contributory negligence. The appellant has invoked the doctrine of the last clear chance. The court also found that the motorman did not actually discover the peril of the deceased until within five meters of the place of the accident. This distance, under the evidence in this case, was unmistakably too short to stop the car in time.

We shall discuss the doctrine of the last clear chance because it has figured prominently in our consideration and its non-applicability is decisive of the case.

The appellee insists that the doctrine of the last clear chance is only applicable where the peril of a person killed or injured is actually discovered in time to avert the accident, and a majority of the court has been inclined to agree. We do not find it necessary definitely to decide the question. The appellee drew attention to *Chunn* v. *The City*

*& Suburban Railway of Washington*, 207 U. S. 302. That was a case appealed from the Court of Appeals of the District of Columbia. In that jurisdiction the doctrine of the last clear chance is applicable, not only where the peril of the injured person is actually discovered, but also where, in the exercise of due care, the defendant could have discovered the peril. *Washington R. & C. Co.* v. *Cullember,* 39 App. D. C. 324.

In this last-named case the court also insists that there was nothing in the decision of the Supreme Court of the United States in the *Chunn Case, supra,* excluding the possibility of the wider extension of the doctrine as applied by the said Court of Appeals of the District of Columbia. Indeed, while a number of courts, and especially the Federal courts, make actual discovery of peril a condition precedent to the application of the doctrine, there are many others courts and perhaps the greater number of them that will permit a recovery where the defendant in the exercise of due care should have discovered the peril. *Bourrett* v. *Chicago & N. W. R. Co.,* 36 L. R. A. (N. S.) 957, and citations; 36 Cyc. 1565 *et seq.*

The forerunner of all cases applying the principle was *Davies* v. *Mann,* reported in 19 English Ruling Cases, 190, 10 Mees. & Wels. 546. A donkey lawfully on a highway, but fettered, was killed by the defendant coming in a carriage at a smartish pace. The court held that the defendant might have avoided the accident in the exercise of due care. The proximate cause of the death was taken to be the act of the defendant in coming at a smartish pace on the highway and not stopping. No mention is made of the actual discovery of the peril.

Although not absolutely essential to the decision of the case, in *Vargas* v. *Monroig,* 15 P. R. R. 26, we cited *Davies* v. *Mann, supra.* We said that there were many cases which decide that although a complainant might, by the exer-

cise of caution, have avoided the accident, yet he may nevertheless recover if it be shown that the defendant might have avoided the accident by the exercise of due care. The evidence in the case of *Vargas* did not show that the peril was actually discovered. Perhaps in each case an assumption of such knowledge was implicit in the decision. An examination, however, of all the jurisprudence convinces us that a definite position should be postponed for a fuller presentation by counsel.

When the peril is actually discovered in time to avert the accident, a number of courts, under certain conditions, disregard the contributory negligence of the injured person. With this exception, and barring cases of malice or recklessness, the rule, we think, excepting, perhaps, in Missouri, is of universal application that the concurrent negligence of the injured person will prevent a recovery. *Drown* v. *Northern Ohio Traction Co.,* 10 L. R. A. (N. S.) 421; *Dyerson* v. *Union Pacific Co.,* 7 L. R. A. (N. S.) 132; *Davies* v. *Mann, supra; Bourrett* v. *Chicago & N. W. R. Co.,* 36 L. R. A. (N. S.) 957 and note; *Robbins* v. *Pennsylvania Co.,* 245 Fed. 441; *Little Rock Ry. & Electric Co.* v. *Billings,* 187 Fed. 960; 25 R. C. L. 1258. That is to say, despite the duty of the defendant to avoid injury, a person may not recover if his own negligence continues actively up to the moment of the accident. Where it was possible for a complainant, equally with the defendant, to avoid the accident at the last moment, no action arises. The most general application of the doctrine of the last clear chance is where the injured person was originally negligent but has no present power or ability, more or less plainly visible to defendant, to avert the accident.

Under this idea of concurrent negligence some courts consider that the injured person's negligence has ceased where he falls in a drunken stupor on a track of a railroad company, but others regard the voluntary intoxication of

a person as a continuing negligence. *Little Rock Railway & Electric Co.* v. *Billings*, 31 L. R. A. (N. S.) 1031, and monographic note. If this court should regard the intoxication of the deceased as concurrent negligence, this consideration would be decisive of the case. Similarly, however, as on the proposition of whether the undiscovered peril permits the application of the doctrine, we prefer to postpone a definite decision of whether voluntary intoxication rendering a person helpless is to be regarded as an act of continuing negligence. Given the prohibitions in the Constitution of the United States and the several Acts of Congress applicable to Porto Rico, it is a serious question whether voluntary intoxication should not be regarded as continuing negligence and also whether a person who permits himself to be intoxicated to a point of helplessness should not be said to have intended the natural and probable consequences of his act and be guilty of concurrent negligence. In this discussion we are barring certain acts of the defendant which are generally held to be the proximate cause. It is well settled that ordinarily the acts of an intoxicated man are to be considered in exactly the same light as if he were sober.

If the defendant's car was going at such a rate of speed that it could not stop, as alleged in one of the paragraphs of the complaint, then after the possibility of seeing the peril of the man on the track arose there was no opportunity to stop the car in time. In all cases the application of the doctrine depends upon the possibility of averting the peril after it was actually discovered or could have been discovered in the exercise of due care. *State* v. *Cumberland etc. R. Co.*, 106 Md. 529, 16 L. R. A. (N. S.) 297; *Illinois Central R. Co.* v. *Nelson*, 173 Fed. 917; *Smith* v. *Metropolitan Street R. R. Co.*, 201 S. W. 569.

That when a complainant intends to rely on the application of the doctrine of the last clear chance he must allege

the necessary facts, will appear from the following citations: *Drown* v. *Northern Ohio Traction Co.*, 10 L. R. A. (N. S.) 421; *Emmons* v. *Southern Pacific R. R.* (Oregon), 191 Pac. 334; *Hawkins* v. *Missouri K. & T. Ry. Co. of Texas*, 83 S. W. 52; *Hart* v. *Northern Pacific Ry. Co.*, 196 Fed. 188. When the complainant relies on an ultimate or supervening duty on the part of the defendant and a neglect of that duty, the defendant should be given an opportunity to defend against such charges. The complaint in this regard is not all that it should be, but inasmuch as appellee does not discuss this point we shall place no insistence on it. We may remark in passing that the doctrine of the last clear chance is not directly considered by the court, except so far as it was involved in a citation, apparently made for another purpose.

Perhaps a pleading may not be so important if the defendant at the trial stands by and permits the doctrine to be invoked. Sections 136 *et seq.*, Code of Civil Procedure, *People* v. *Heirs of Valdés*, 31 P. R. R. 213. But nothing of the kind appears. On the contrary, the opinion of the court held the negligence of the defendant to be the failure to keep a lookout, and then found that the defendant was guilty of contributory negligence. The doctrine is applicable in the face of contributory negligence, and here there was absolutely no consideration by the court of the said doctrine. There is nothing in the record, including the transcribed arguments of counsel, to show that complainant invoked the doctrine.

Coming to the evidence, the court found that the car was running at topnotch speed and that the defendant only saw the danger at a distance of five meters. The court found that the car could have been stopped within a distance of thirty meters or a little more, but we cannot agree with the court that the evidence tends to show that fact. The positive evidence of defendant's witnesses was to the

contrary, and the testimony of complainant's witnesses in this regard satisfies us not at all. A car running at 30 miles an hour will cover 44 feet in a second. Three seconds will make the distance covered 132 feet, or over a hundred, allowing for a reducing speed. To bring a car to a full stop within three seconds from the time a peril is visible would be an achievement, especially when the other duties of defendant are to be considered. The motorman must discover the peril, must apply his brakes, and he owes a paramount duty to injure no one in his car. Supposing even a speed of less than thirty miles an hour, we were not convinced by the evidence that the car could have been stopped in time. Where a trolley car is going at topnotch speed, 100 feet, or perhaps even more, is generally necessary. For similar facts and reasoning the following cases are applicable: *Kramer* v. *New Orleans City & L. R. Co.*, 51 La. Ann. 1689; *Royalty* v. *Lusk* (Mo. App.) 198 S. W. 472.

The burden of proof is on the complainant to show every element necessary to the application of the doctrine: *Smith* v. *Metropolitan St. Ry. Co.* (Mo. App.), 201 S. W. 569; *Texas & P. R. Co.* v. *Buddow*, 90 Texas, 26; *Pennell* v. *Chicago Rock Island & Pacific*, 153 Mo. App. 566; *Kramer* v. *New Orleans City & L. R. Co.*, 51 La. Ann. 1689; *St. Louis & S. F. R Co.* v. *Summers et al.*, 173 Fed. 358. This includes the proof that the car could have been stopped in time.

The appellee strongly urges that the complainant failed to make out a case of negligence. Under the authorities cited and generally, the burden was on the complainant to show a breach of duty on the part of the defendant. This burden extends to showing the peculiar conditions surrounding the spot where the accident occurred. When there is even slight evidence that the spot is frequented or has become dedicated to the public, the fact that the accident oc-

curred on the right of way of the railroad is of relative unimportance. But when the defendant, as here, shows that the accident occurred on its right of way, the burden is on the complainant to show that the spot was merged in the public road or was a frequented one, or some other similar element. The evidence in this case tended to show the contrary.

The deceased was a trespasser. On its rights of way at an unfrequented spot a defendant company is under no duty to keep a lookout for trespassers. Thompson on Negligence, Supp., Sec. 1709.

The complainant has shown us nothing that would create a duty on the part of defendant to anticipate the presence of the deceased at the spot where he was found or to find any other person there. That there was no duty to run slowly at this unfrequented spot the following citations show. *Morales* v. *P. R. Ry., L. & P. Co.*, 27 P. R. R. 169; *Olavarría* v. *P. R. Ry., L. & P. Co.*, 26 P. R. R. 584.

We have been cited to nothing that makes it the duty of a railroad company before rounding a curve on its right of way to lessen its speed or to anticipate the presence of persons at an unfrequented spot. Of course, a defendant must not run around a curve recklessly at a frequented spot. After rounding the curve at a permissible speed it was impossible to have stopped this car in time, so that the supposed violation of duty here has no causal connection with the accident.

In short, the intoxication of the deceased was the proximate cause of the accident and no supervening negligence of the defendant was shown.

Incidentally, we have discussed a number of the assignments of error and shall consider some of the others.

The court found that the defendant did not see the deceased until the car was five meters away, and hence its fail-

ure, if any there was, to apply the emergency brakes could not have been the negligence causing the accident.

The mere fact that a person is an employee of the company does not incapacitate him from giving testimony as an expert.

The appellant does not convince us that the evidence of habits of intoxication is entirely irrelevant; nor that the testimony of witnesses of the condition of the deceased on the same day shortly before the accident is inadmissible; nor yet that one needs to be an expert to testify to the intoxication of a person.

One alleged error has caused us some difficulty. Some of the testimony of the witnesses in regard to intoxication was admitted exclusively on the theory that the habits of intoxication tend to reduce the earning capacity and hence the amount of damages. Nevertheless, in its opinion, the court refers to some of the evidence so given as acts tending to prove the actual intoxication.

The proof of intoxication was clear and convincing and the court may have been careless in referring to this testimony as tending to prove the main fact. As we have already said, we are not convinced that habits of intoxication may not have some relevancy. The error, if any, was harmless, inasmuch as the evidence, as tending to prove an actual state of intoxication, was merely cumulative. The only result of sending the case back on this ground would be that the court would still necessarily find a state of intoxication at the time of the accident. We should find an intoxicated state if the court had found otherwise. The appellee did not attempt to offer the supposed objectionable evidence for any other purpose than in mitigation of damages, and there is no indication of any effort to have undue testimony considered. Furthermore, the intoxication *vel non* has no bearing if, as we have held, no negligence of the defendant, causing the accident, was shown.

On the question of the failure to perform its duty to maintain a lookout, or the question of the way the car should have been run at this alleged unfrequented spot, photographs were offered in evidence. They have been certified to us in no form and hence we are in no condition to reverse from any standpoint. Objection was made to the admission of these protographs as not identified by the photographer; but, like signatures and other matters, persons showing a competent knowledge may identify.

Other supposed errors have either been treated by us necessarily or, by their lack of specification, do not need further consideration.

The judgment appealed from must be

*Affirmed.*

Justices Aldrey, Hutchison and Franco Soto concurred.
Mr. Chief Justice Del Toro dissented.

DISSENTING OPINION OF MR. CHIEF JUSTICE DEL TORO.

Laura Vidal, widow of Aguado, brought an action against the Porto Rico Railway, Light & Power Company to recover damages for the death of her son, Carlos Aguado y Vidal, as a result of the negligence of the defendant in the operation of one of its electric cars on August 26, 1917.

The complaint was dismissed and the plaintiff appealed to this Supreme Court, assigning twenty errors in her brief. According to the opinion that I have formed of the case, its study should be centered upon three fundamental questions of decisive importance, to wit: Whether or not the negligence of the defendant follows from the facts found and the evidence examined; whether or not the plaintiff's son was guilty of contributory negligence, and, if there was contributory negligence, whether the defendant had the last chance to avoid the injury.

The trial judge stated the case as follows:

"The plaintiff is of age, a widow, resident of San Juan and the

lawful mother of Carlos Aguado Vidal, and the defendant is a corporation organized under the laws of Porto Rico with its main office in San Juan and is the owner of an electric tramway line extending from San Juan through Santurce to Río Piedras on which the defendant operates its cars in the service of transporting passengers to and from San Juan, Santurce and Río Piedras. It also has a branch line which leaves the main line near the San Antonio bridge in Santurce and runs through the suburb called Condado as far as Borinquen Park.

"On August 26, 1917, at about 12.30 p. m., defendant's electric car No. 31, while running from San Juan towards the park between Stops 55 and 54 on the Condado line at a place near Dos Hermanos bridge at the maxim rate of speed, ran over Carlos Aguado Vidal near Stop 55 and fractured both of his legs, as a result of which he died a few hours later. At the time of the accident Aguado Vidal was lying on the ground with his legs across one of the rails of the track. The motorman who was driving the car saw the body only when he was five meters distant and then tried to stop the car by applying the emergency brake, or reverse throttle lever, but could not prevent the two front wheels and one of the rear wheels from passing over Aguado's legs. The scene of the accident, as the court had opportunity to observe at an ocular inspection, is the western point of the Condado peninsula and a few meters distant from the eastern extremity of the causeway that crosses the Condado bay from Dos Hermanos bridge to the said peninsula. The tramway track over the said causeway is straight for approximately 400 meters, but from the end of the causeway towards Stop 54 it curves slightly on an easy upgrade. The car was running at full speed with the throttle open to point nine and upon approaching Stop 55, which is the stop nearest the causeway, the motorman did not attempt to reduce speed until the very moment when he became aware that Aguado was lying with his legs across one of the rails."

The court then sums up the allegations of the complaint and the answer and in considering the elements of negligence in connection with the evidence and jurisprudence, says:

"*Immoderate speed.*—Stop 55 is not an obligatory stop for the electric cars and the cars stop there only when passengers desire to get off or on. It was not proved that any person was waiting at

the stop or that passengers on the car manifested a desire to get off there. The track runs through the Condado suburb. It is not negligence *per se* for an electric car company to run its cars rapidly in a suburb. Morales v. P. R. R. L. & P. Co., 27 P. R. R. 704, citing Olavarría v. P. R. R. L. & P. Co., 26 P. R. R. 584.

"*Condition of brakes.*—It is alleged that the brakes, especially the emergency brake, were in such a condition that because of their imperfection, defects and insecurity the car could not be stopped in time to avoid the accident. The evidence shows that although car No. 31 had been in use for more than eight years, the emergency brake, or reversing device, was in good condition. That lever is operated to reverse the motor and, consequently, the wheels of the car. It controls the mechanism for stopping the car within the least possible distance and most suddenly. Car No. 31 had also Standard brakes which operate by pressure on the wheels. These brakes were not applied because the motorman saw that in order to stop the car in time the reverse lever would be more effective and rapid. Other witnesses were of the same opinion. It was not proved that either this device or the Standard brake was defective.

"*Duty of motorman to have seen Aguado.*—It is alleged that another cause of the accident was that 'from his position the motorman could see and did see plainly the body of the deceased at a distance of more than thirty meters, which was a sufficient distance within which to stop in time and avoid the accident.' The motorman testified that he became aware that Aguado was lying on the ground with his legs across the track at a distance of about five meters. Could he have seen the body before? We were convinced by the ocular inspection that the motorman could have seen the legs of a man across the track at least 30 or 35 meters before arriving at the place. Was it his duty to see them? Before arriving at Stop 55, and even if he was convinced that there was no one waiting there, the motorman should have taken the precaution in rounding the curve to ascertain whether the track ahead was free from dangerous obstacles. Was it his duty to keep his eye on the track constantly and at all times and places in order to avoid accidents?

"If the duties of a motorman were only to start and stop the car, probably some automatic apparatus would have been invented to substitute him. But such is not the case. The motorman controls the speed of the car, watches the track, stops the car when there are passengers waiting at the stops or when the conductor

signals him to stop for others to get off; and, besides, it is his duty to inform himself of the condition of the track and decide discretionally when he should or should not stop the car when there is some obstacle on the track and when, if the car is not stopped, injury may be caused or the life or safety of those in the car or outside of it may be put in peril.

"We think that at that place the motorman could have seen Aguado's legs from a distance of 30 to 35 meters and was charged with keeping an eye on the track so as to be able to see any obstacle that might be in front of the car. If he failed to perform that duty and if, as the motorman himself, Tomás Ramírez, testified, he did not see Aguado until he was within five meters of him, it follows that the accident was due in part to his failure to perform that duty strictly."

The court then takes up the second question to which I referred at the beginning, saying:

"We say in part because the defendant established as a defense the contributory negligence of the deceased, and it is evident that this was another direct and immediate cause of the accident. .

"Why was Aguado lying across the track in that position? The plaintiff says that he had fallen in a swoon or sudden illness. We can not presume that this was the case because of the fact that he was lying there. That presumption would be destroyed by the evidence to the contrary introduced by the defendant. Salas testified that he saw Aguado 45 minutes before the accident 'staggering along the road' and asked him what was the matter, to which Aguado replied: 'I am drunk.' To prevent him from falling Salas and another witness, Claro Torres, placed him near a pillar of the bridge. Shortly thereafter Aguado arose and started in the direction of San Juan. He walked some distance and then turned back on the Dos Hermanos bridge. Witness Finlayson, the immediate superior of Aguado in the Department of the Interior while Aguado was working there as draftsman, testified that he 'drank too much.' Claro Torres, who assisted Salas in placing Aguado on one side of the bridge, testified that he was staggering and confirmed Salas' testimony except as regards the reply made by Aguado, saying that when he asked Aguado what was the matter Aguado replied: 'I am a little sick.' Policeman Pagán testified that many times Aguado's mother, the plaintiff in this case, had asked him to treat Aguado

considerately.   That he found him drunk frequently and took him home; that the day before the accident he found him lying on the ground and Stop 19 and gave him some coffee from a nearby shop; that on another occasion he saw him drunk in a trolley car.   Witness Van Ryn testified that he saw Aguado seated on the San Antonio bridge with his trousers unbuttoned, 'in bad shape,' on the same day of the accident when the witness was passing in electric car No. 31, coming from the park via the Condado towards San Juan.   On the return trip of the same car, of which he was the conductor, the accident occurred.   This witness, therefore, corroborates the testimony of Salas and Torres.   He also testified that on other occasions he had seen Aguado 'half drunk' and that he was almost always in that condition.

"The testimony of these witnesess was not rebutted at the trial except in a general way by engineer Skerret who testified that while Aguado was employed in the Department of the Interior where the witness was Superintendent of Public Works, he did not observe that Aguado used to get drunk.   Notwithstanding the respectability of the witness, this testimony does not destroy the affirmative testimony of the other witnesses who saw Aguado immediately before the accident in an abnormal state of alcoholic intoxication.   Such being the case, he had no right to lie on the track, as he did, making it possible for the car to run over him because his body was somewhat hidden by the grass and the piles of stones, as was proved, and only his legs were visible.   These facts and the lack of strict vigilance on the part of the motorman to assure himself that there was a clear track ahead, coöperated immediately and directly to cause the accident.

"In the case of Dickson v. Chattanooga Ry. & Light Co., 237 Fed. 352, the Circuit Court of Appeals for the Sixth Circuit said:

" 'It is well settled that one who is injured by . . . . . a street car in a street, may recover for such injury, notwithstanding his own initial or preceding contributory negligence in exposing himself to danger, provided he is using the street or highway at the time for a proper and legitimate purpose and his negligence has terminated, . . . . .

" 'On the other hand, it is equally well settled that one who makes such an improper, wrongful, or unlawful use of a street, or railroad track, as to become a trespasser thereon, and, in so doing, places himself in a position where he is likely to come into collision

with a passing train or car, cannot recover for injuries so received, unless those in charge of the train or street car, by the exercise of reasonable care and diligence after the discovery of his peril, might have avoided the accident. . . . . . the employés of a railroad company, operating its trains and cars, owe no duty to a trespasser upon the railway tracks to keep a lookout for him, and that their only duty towards him is to exercise due care not to injure him after the discovery of his peril.

" ' . . . . No one will question that an' intoxicated man, who wanders from the sidewalk of a public street upon adjoining private premises and lies down, is a trespasser, and continues to be a trespasser as long as he remains there, regardless of the degree of his intoxication.'

"The foregoing doctrine has been sustained substantially by our Supreme Court in the case of Font vs. P. R. R. L. & P. Co., 21 P. R. R. 7. The court held that the plaintiff could not recover damages, because it had been proved that when he was struck by the electric car he was playing on some boards placed at a crossing for the convenience of persons crossing the track. The court cited 119 Mass. 472, 24 A. R. 23, and 27 L. R. A. 527, and summed up the doctrine by saying that even though it could be concluded from the evidence that the defendant company was negligent to a certain extent in regard to the placing of the boards, the contributory negligence of the plaintiff was so clear that it effectively barred the rendition of a judgment in his favor."

Hence, the conclusions of the trial court were (1) that there was, negligence on the part of the defendant, (2) that there was such contributory negligence on the part of Aguado as should be considered the real cause of the accident, and (3) that therefore the complaint should be dismissed without special imposition of costs.

The defendant did not appeal from the judgment, which was in its favor; but in its brief the defendant maintains that there was no proof of negligence on its part, thus attacking the first of the conclusions of the trial court. In my opinion the defendant is mistaken.

Before rendering judgment the court inspected the place where the accident occurred.

The motorman who was driving the car which caused Aguado's death testified for the defendant as follows:

". . . . . and upon taking the curve, the car running at its speed, I saw a man on the track, only when the car was about five meters from him, as the legs of a man across the track, his body being almost invisible because it was between two piles of stone, and only the legs across the right rail could be seen; but all that I could do when I saw a man lying there with his legs across one of the rails was to operate the reverse lever, and I did so immediately in order to prevent the car from running over him, yet the car reached the place where the man was and cut off his legs."

Later he added:

"That the track was almost straight; that he was looking at the track; that it was possible to see for a distance of more than five meters, referring to the space between the two rails."

Marcelino Saldaña, a corporal of the insular police who was a passenger in the car occupying one of the front seats, testified as follows:

"That from his seat he could see for quite a distance and not less than 40 meters, or perhaps a little farther, because that seat allows the person occupying it to see farther than the motorman can see. That on that day he saw the body of a man lying on the track; that he could see it; that he distinguished the body at a distance of about 40 meters, and he observed that the motorman noticed it exactly at the same time, for he saw the motorman making great efforts to stop the car, but without success; that the motorman began to act when at a distance of 40 meters and attempted to stop the car at the same time that the witness saw the body; that the car did not respond because it seems the brake still had much slack chain, or something of the like; that the car did not stop, but went on and reached the place where the man was; that the motorman stopped the car after it had passed over the man's legs; that it was after everything had passed that the motorman succeeded in stopping the car."

Insistent cross-questioning did not shake his testimony. It is true that the defendant attempted to impeach his veracity and that in saying that he yelled when he saw the

legs of the man forty meters away he seems to have exaggerated, but it appears to be true also that they could be seen from that distance.

Summarizing the facts on this point and weighing the evidence most favorably for the defendant, it appears that the motorman saw Aguado's legs at five meters distance and could have seen them thirty or forty meters away if he had been looking at the track upon rounding the curve, or if he had been looking ahead towards the next stop in compliance with one of his most simple and elementary duties. Luis Calderón, a witness for the defendant and an inspector of its cars, answered as follows a question asked him by the court: "When a car is approaching a stop it is the duty of the motorman to see whether there are any passengers at the next stop."

Now, can a trolley car be stopped within thirty meters? The evidence on this point is contradictory.

Francisco Becerra, an electro-mechanical engineer and a witness for the plaintiff, testified as follows:

"Under those conditions, assuming that the car is in good condition and considering the curve and the grade, the witness believes that a car can be stopped within a distance of eight or ten meters. That in a place like that if the car is in perfect condition, the maximum distance within which it can be stopped should be eight or ten meters. (Plaintiff's counsel asked a question, the defendant objected, the court sustained the objection and the question was withdrawn.) That a car going at that rate of speed at that place, considering the obstacles to which reference has been made, that is, the curve, the length of the car, etc., should be stopped, if in perfect condition and running at full speed, within eight or ten meters."

Samuel Patterson, a witness for the defendant and inspector of the line, testified as follows:

"When asked by the judge within how many meters could a car running at the speed developed by nine points be stopped upon applying the emergency brakes, he replied that it would depend upon the track, or whether it is dry or wet, and that if the car is

running under nine points it may be stopped within less than sixty meters, which is a good stop; that a car can be stopped within less than sixty meters is a good emergency stop. Judge.—The question of the court is, at the said speed of nine points and the track being dry, what is the least distance in which the car can be stopped? Witness.—About fifty meters.''

The expert testimony in this case is typical. Educated witnesses who generally put their intelligence and technical knowledge at the service of the party offering their testimony are in many instances the greatest obstacle that a court encounters in endeavoring to impart justice. Perhaps Becerra exaggerated, but in my opinion his testimony is worthy of more credit than that of Patterson. I can not conceive that in the present state of mechanical progress an electric car ascending a slight grade can not be stopped within thirty meters.

In view of the foregoing facts and conclusions and in order to avoid a lengthy discussion of the evidence and the exceptions taken, the defendant's own presentation of the case may be accepted, as follows: That the place where Aguado was lying was not a public street, nor a crossing, nor an obligatory stop; therefore, that Aguado had no right to be there. It may be admitted also that the unconscious state of Aguado, or the fact that he had fallen with his legs across the track and so remained, was the consequence of his voluntary condition of intoxication. We may, in short, admit the contributory negligence of Aguado, but notwithstanding this, it having been proved that the motorman could have seen Aguado with his legs across the track from a distance of at least thirty meters if he had exercised reasonable care in the performance of his duties, and could have stopped the car and thus avoided the accident, but did not, the defendant is liable.

All of the jurisprudence does not support my opinion. Ruling Case Law, summing up a large number of decisions, says:

"The generally accepted rule that a railroad company owes no duty to a trespasser on its premises or tracks except after discovering his peril is equally applicable to street railway companies, and while such companies are liable for injuries wilfully or wantonly inflicted on trespassers on their tracks, it is only after those who are operating a street car fail to exercise reasonable care to avoid injuring a trespasser, after he is discovered and his peril becomes apparent, that they are held to be guilty of wantonness or recklessness, such as to overcome the contributory negligence of the trespasser. A wrongdoer and trespasser cannot recover for injuries which are the joint consequence of his own wrong and the negligence of another, and this remains true though the person injured is a child and only does what children of his age and intelligence may reasonably be expected to do." 25 R. C. L. 1236.

But I believe that the matter may and should be considered further. Hence, I have concluded that without the necessity of taking Saldaña's testimony as a basis, which would place the case entirely within the rule as stated in Ruling Case Law, the liability of the defendant is evident notwithstanding Aguado's negligence, because the defendant had the last chance to avoid the accident if its motorman had complied with his elementary duty of watching the track on which he was engaged in driving the car, but did not do so. I call it an elementary duty as I have in mind not only those who might be upon the track with or without right, but also the passengers whom the company contracted to transport safely on a clear track. If instead of the frail legs of a human being a steel bar had been firmly placed at the same place, the car would have jumped the track and the passengers would have been exposed to the consequent dangers. No clearer obligation can be imagined. When I reflect upon this case the only manner in which I can conceive that the motorman failed to see Aguado's legs, and not only his legs but his whole body, at a distance of forty meters, is by his absolute abandonment of his post by looking somewhere else and letting the car run mechanically.

The legal point of view that I have selected is not without support in American jurisprudence. I rely on logical reasoning from the facts and especially on repeated holdings of the Supreme Court of North Carolina. Whatever I might say is remarkably well said and discussed in the opinion written by Judge Avery in the case of *Pickett* v. *Wilmington & W. R. Co.,* decided November 19, 1895. The opinion reads in part as follows:

"The most important question presented by the appeal is whether the court erred in refusing to instruct the jury that if the plaintiff's intestate deliberately laid down upon the track, and either carelessly or intentionally fell asleep there, the defendant was not liable, unless the engineer actually saw that he was lying there in time, by the reasonable use of the appliances at his command, to have stopped the train before it reached him. * * *

"In Herring v. Railroad Co., 10 Ired. 402, this court followed what was at the time the generally accepted doctrine,—that persons who went upon railroad tracks at places other than public crossings were trespassers, to whom the carrier owed no duty of watchfulness, and for whose safety it was in no wise liable, unless its engineer actually saw that there was danger of injury from a collision, and wilfully refused to use means by which he could have averted it. In Gunter v. Wicker, 85 N. C. 310, this court gave its sanction to the principle first distinctly formulated in Davies v. Mann, 10 Mees. & W. 545, that 'notwithstanding the previous negligence of the plaintiff, if at the time the injury was done, it might have been avoided by the exercise of reasonable care and prudence on the part of the defendant, an action will lie for damages.' This doctrine was subsequently approved in Saulter v. Steamship Co., 88 N. C. 123; Turrentine v. Railroad Co., 92 N. C. 638; Meredith v. Iron Co., 99 N. C. 576, 5 S. E. 659; Roberts v. Railroad Co., 88 N. C. 560; Farmer v. Railroad Co., Id. 564; Bullock v. Railroad Co., 105 N. C. 180, 10 S. E. 988; Wilson v. Railroad Co., 90 N. C. 69; Snowden v. Railroad Co., 95 N. C. 93; Carlton v. Railroad Co., 104 N. C. 365, 10 S. E. 516; Randall v. Railroad Co., 104 N. C. 410, 10 S. E. 691. And it was repeatedly declared in those cases that it was negligence on the part of the engineer of a railway company to fail to exercise reasonable care in keeping a lookout, not only for stock and obstructions, but for apparently helpless or infirm human

beings on the track, and that the failure to do so, supervening after
the negligence of another, where persons or animals were exposed to
danger, would be deemed the proximate cause of any resulting
injury.

"It was after al of these precedents following Gunter v. Wicker,
supra, that the court in Deans v. Railroad Co., 107 N. C. 686, 12
S. E. 77, was confronted with the question whether a railway com-
pany was liable where, by ordinary care, its engineer could have
stopped its train in time to prevent its running over a man lying
asleep upon its track, under the doctrine of Gunter v. Wicker, or
whether, the accident having occurred at a place other than a public
crossing, the company could be held answerable, under the rule as
stated in Herring v. Railroad Co., only where it was shown that the
engineer actually saw the trespasser, and had reasonable ground to
comprehend his condition. Upon mature consideration, the court
overruled Herring's Case, and stated the rule applicable in such
cases to be that 'if the engineer discover, or by reasonable watch-
fulness may discover', a person lying on the track asleep or drunk,
or see a human being, who is known by him to be insane or other-
wise insensible to danger, or unable to avoid it, upon the track in his
front, it is his duty to resolve all doubts in favor of the preservation
of human life, and immediately use every available means, short
of imperiling the lives of passengers on his train, to stop it.' This
rule was approved in express terms in Meredith v. Railroad Co.,
108 N. C. 618, 13 S. E. 137; Hinkle v. Railroad Co., 109 N. C.
472, 13 S. E. 884; Clark v. Railroad Co., 109 N. C. 444, 445, 14
S. E. 43; Norwood v. Railroad Co., 111 N. C. 240, 16 S. E. 4;
Cawfield v. Railroad Co., 111 N. C. 600, 16 S. E. 703."

The opinion goes on to discuss the several theories and
decisions on the matter and concludes as follows:

"We are of opinion that when, by the exercise of ordinary care,
an engineer can see that a human being is lying apparently helpless,
from any cause, on the track in front of his engine, in time to stop
the train by the use of the appliances at his command, and without
peril to the safety of persons on the train, the company is liable
for any injury resulting from his failure to perform his duty. If
it is the settled law of North Carolina (as we have shown) that it
is the duty of an engineer on a moving train to maintain a reason-
ably vigilant outlook along the track in his front, then the failure
to do so is an omission of a legal duty  *  *  *.  The court com-

mitted no error of which the defendant could justly complain in stating the general rule which we have been discussing." *Pickett* v. *Wilmington & W. R. Co.*, 23 S. E. 265–268.

For the foregoing reasons I am of the opinion that the judgment appealed from should be reversed and substituted by such a judgment as this Supreme Court may consider just and proper.